THOMAS J. McQUIN, ADMINISTRATOR, APPELLEE, V. MISSOURI PACIFIC RAILROAD CORPORATION ET AL., APPELLANTS.

FILED JANUARY 29, 1932.   No. 27833.

424

*Kennedy, Holland & DeLacy* and *W. G. Kieck,* for appellants.

*C. A. Rawls* and *Brogan, Ellick & Van Dusen, contra.*

Heard before GOSS, C. J., DEAN and EBERLY, JJ., and CHASE and LOVEL S. HASTINGS, District Judges.

HASTINGS, District Judge.

This action is brought by Thomas J. McQuin, as administrator of the estate of Clifford J. McQuin, against the Missouri Pacific Railroad Corporation and H. F. Kilmer, as defendants, to recover damages growing out of the death of Clifford J. McQuin, due to a collision between the automobile he was driving and a freight train of defendant railroad company which was being backed over a railroad crossing. The defendant Kilmer was a brakeman taking part in the operation of the train. From a judgment for $6,000 on a verdict of the jury the defendants have appealed.

The acts of negligence alleged by plaintiff and submitted to the jury were: That the train of the defendant rail-

road was being operated without any headlight or other light on any part of the train that was visible from the direction toward which such train was moving at the time; without any person on said crossing to warn travelers upon said highway of the approach of said train to the crossing; without giving any warning by light, bell or whistle or otherwise of the approach of said train to said crossing; and without keeping and maintaining a lookout for travelers approaching or about to pass over said crossing.

Defendants alleged contributory negligence on the part of plaintiff's intestate, in that he failed to look and listen for the approaching train at a point where looking and listening would have been effective, and that in the exercise of reasonable care ought to have known that a train was approaching and that he would be struck if attempting to cross in front of the same.

The collision occurred about 1 o'clock in the morning of March 21, 1930, about one-half mile south of the Village of Union, in Cass county, on a crossing of the defendant railroad.

It appears from the evidence that a main traveled highway parallels the railroad tracks for about a half mile south of Union, where the main highway turns to the east and away from the railroad tracks. From that place, there is a road leading from the main highway west, which crosses the railroad track about fifty feet west from where the main highway turns to the east. Where the road going west crosses the railroad track, the defendant company maintained the usual public crossing with the usual crossing sign and cattle guards at the south end. This road is entirely unobstructed until about fifty feet west of the railroad tracks where there is a large iron gate in the right of way fence. The road extends from that point west about one-eighth of a mile and then about one-eighth of a mile south to the home of one Wencel, where it terminates.

The crossing was constructed by the defendant railroad. more than twelve years prior to the accident. The road

in question, although it was not a regularly laid out high-way, had been in use for many years prior thereto, and at least from the time the crossing was established had been open for public travel and accommodated a portion of the traveling public.

At the point where the road crosses there are two tracks, the east track, being the main line track, and the west track, referred to in the evidence as the passing track. The tracks run southeasterly. Fifteen hundred fifty-four feet southeasterly of the crossing is a switch which connects the passing track with the main track. The distance between the west rail of the main track and the west rail of the passing track is thirteen feet and ten inches. It was the custom of the defendant company to leave cars on the passing track between the crossing and the switch that were to be taken up later by trains going south on the main line.

On the night of the accident, the decedent, Clifford J. McQuin, in company with George Kennison, Wymore Fletcher, and Donald McQuin, had gone from Union in a five passenger sedan to the home of Mr. Wencel, where they stayed until nearly 1 o'clock. When they left for home the decedent was driving the car, with George Kennison seated at his right in the front seat, and with Wymore Fletcher and Donald McQuin riding in the back seat; Fletcher riding on the right side and McQuin on the left side. The night was partly cloudy and dark; the headlights of the car were lighted. From the Wencel place they drove north and then east. In driving along the east road, they saw no lights and heard no noise that might indicate the presence of a train, but from the reflection of the automobile lights saw some box cars on the passing track. They continued on east and drove through the gate at a point about twenty-five or thirty feet west of the west rail of the passing track and about half of the distance between the gate and said track, where the car was stopped. Kennison got out, leaving the right door open, and went back to close the gate, which they had left open

when they went over to Wencel's place earlier in the evening. After Kennison closed the gate decedent asked him if he saw or heard any train. He looked and listened and stated that he could neither hear nor see any train south of the crossing; that all he could see was a part of a string of box cars, but it was so dark that he could not see how far they extended south and east; that he thought he heard a train coming into Union from the north, but could not see it. Fletcher and Donald McQuin both testified that they looked and all that they could see was a part of the string of box cars, and they could not tell how far they extended south, but estimated that the north end of the cars was within fifteen or twenty feet of the crossing, and, although they looked and listened, there was nothing to indicate the presence of a train south of the crossing. Kennison, Fletcher and Donald McQuin all stated positively that they heard no sound of a whistle or of a bell ringing or of the movement of a train south of the crossing, and that, had the bell been ringing or the whistle sounded, they would have heard it. Kennison got into the car and the decedent drove the car from there on to the point of the collision at about four or five miles an hour. When the front of the automobile was just over the west rail of the main track, Fletcher and Donald McQuin saw the north end of a box car within five or six feet of them; there was no light upon the box car that they could see and all that they could see was a dark object coming toward them. When they saw the box car within that distance it was too late to avoid the accident. Donald McQuin and Fletcher further testified that during the time they were proceeding from the place where they had stopped to the point of the collision the decedent was facing towards the east, and that they did not notice him turn his head either to the right or to the left. All of the occupants of the automobile were familiar with the crossing.

The train involved in the collision arrived from Lincoln in Union at about 12:45 a. m. The caboose was left at Union and the conductor and a brakeman remained there,

leaving the engineer, fireman and the head brakeman on the train. The defendant Kilmer, as head brakeman, was controlling the movements of the train. The train, consisting of the engine and twenty-nine box cars of the standard length of about forty-two feet each, proceeded south on the passing track, across the crossing, and left twenty-seven of the box cars on the passing track between the crossing and the switch. The train, then consisting of two box cars and the engine, started back toward Union on the main track with the box cars in the lead.

The brakeman, the engineer and the fireman testified that when they started backing toward Union the headlight was lighted and there was also a headlight on the back of the engine; there was no light on the north end of the lead car. The brakeman was sitting in about the middle of the lead car with a lantern that he used for signaling. It is the testimony of the trainmen that when they started back the engineer blew the whistle and started the automatic bell, and that the bell was ringing from that time on until the time of the collision. The brakeman and the engineer testified that as they were backing up they noticed a light at the crossing but assumed that it was from a fire lighted by hobos. The brakeman then claims that he gave the engineer the signal to slow down, that the engineer responded by slowing the train, and that very shortly thereafter they both observed that the lights were from an automobile which appeared to be standing a short distance to the west of the tracks at the crossing. The engineer, assuming that the person or persons at the automobile had either seen or heard the train and were waiting for it to pass the crossing, increased the speed of the train to about ten miles an hour. Both testified that at the time they first saw the light, which they supposed to be from a fire started by hobos, they were to the east of the string of box cars, and that when they observed that the light was from an automobile they were at or a little past the north end of the string of box cars on the passing track. They testified that when within about three cars length of the cross-

ing the automobile suddenly started up and proceeded to cross the crossing; that the brakeman immediately gave the "washout" or stop signal, the engineer applied the brakes and attempted to stop the train, but it was too late and the lead box car collided with the automobile driven by decedent. The engineer also testified that after the collision he stepped the distance between the crossing and the north end of the string of box cars and found the distance to be one hundred fifty feet. The foregoing is a substantial summary of the evidence adduced by the parties relating to the facts and circumstances surrounding the collision.

On the facts stated, it is contended by counsel for the appellants that, had the decedent looked and listened at the time and at the place where looking and listening would have been effective, he could have seen or heard the approach of the train, and that failing to do so he was guilty of more than slight contributory negligence in comparison with the negligence of the defendants, and that this cause should be reversed and dismissed. It is the settled law of this state that:

"It is the positive duty of an automobile driver approaching a railroad crossing where there is a restricted vision and where he is familiar with said crossing and its surroundings to look and listen at a time and place where looking and listening will be effective; and failure to observe this rule without reasonable excuse therefor is negligence." *Kepler v. Chicago, St. P., M. & O. R. Co.*, 111 Neb. 273. See *Rickert v. Union P. R. Co.*, 100 Neb. 304; *Askey v. Chicago, B. & Q. R. Co.*, 101 Neb. 266; *Seiffert v. Hines*, 108 Neb. 62; *Haffke v. Missouri P. R. Corporation*, 110 Neb. 125; *Stanley v. Chicago, R. I. & P. R. Co.*, 113 Neb. 280; *Tyson v. Missouri P. R. Corporation*, 113 Neb. 504; *Allen v. Omaha & S. I. R. Co.*, 115 Neb. 221; *Moreland v. Chicago & N. W. R. Co.*, 117 Neb. 456; *Lewis v. Union P. R. Co.*, 118 Neb. 705; *Eggeling v. Chicago, R. I. & P. R. Co.*, 119 Neb. 229; *Belz v. Chicago & N. W. R. Co.*, 119 Neb. 312.

In the cases cited it appears that the accidents occurred in daylight and, had the drivers of the cars or vehicles looked and listened effectively, they could have prevented the collisions.

In the instant case a different situation is presented. The accident happened on a dark night, the decedent stopped his car within forty feet of the main track and seemingly exercised caution, in that he was not trusting alone to his own observation and hearing, but requested the person out of the car to look and listen. The door of the car was open and the other occupants of the car looked and listened and saw or heard nothing to indicate the presence of a train southeast of the crossing. It will not be presumed that the decedent could have or did see or hear more than the others. In driving from that point to the place of the collision the track to the southeast would be under decedent's observation as much as under the observation of the other occupants of the car, and they saw or heard nothing to indicate the presence of the train as they moved eastward, although they were looking and listening. At the time that they stopped and looked and listened the train must have been a short distance southeast of the cars upon the passing track.

It is insisted by counsel for the appellants that they should have heard the rumble of the train had they been listening attentively. It is quite evident that the engine and two cars traveling at a speed of about ten miles an hour would, ordinarily, not make any appreciable noise. The movement of the train was toward them, with no light on the rear end of the lead car. It might well be that they would be unable, on account of that fact, to see any part of the light from the headlight of the engine or the light on the tender thereof. The brakeman was sitting in such a position on the car that under the situation existing the light from his lantern might not have been visible to them.

As heretofore pointed out, the distance from the west rail of the passing track to the west rail of the main track

was thirteen feet and ten inches and the distance between the two rails of the passing track was about four feet and eight inches, which would leave a space between the west rail of the passing track and the east rail of the main track of about nine feet, approximately the length of the automobile. Furthermore, the cars on the passing track would extend out over the rail about eighteen inches, while those on the main track would extend out the same distance, leaving about six feet clearance between the cars on the passing track and the cars on the main line, so that no one, no matter how attentively he was looking, might be able to distinguish the cars on the main line track from the box cars on the passing track. After the train had passed the cars on the passing track, the distance would only be about seven and a half feet between the cars on the main line and the east rail of the passing track. The train moving toward the crossing past the cars on the passing track might, under such circumstances, look like a continuation of the cars on the passing track. The distance between the north end of the cars on the passing track and the crossing is shown to have been one hundred fifty feet by the testimony of the only person who measured the distance. The cars on the passing track being that distance from the crossing, it appears that the place where the decedent stopped his car was as advantageous a place to look and listen effectively for the approach of a train from the southeast as any point between there and the main line track. From where he did stop, look and listen he could be as sure whether a train was dangerously near as at any other place between there and the place where the collision occurred.

Counsel for appellants contends that under the evidence it was the duty of the decedent to have got out of his automobile and gone to a point where the train on the main line track could be seen or that he have some one of the other occupants of the car do so, and not having taken such precaution he went upon the crossing at his own risk. In support of that contention counsel insists

that the facts in this case bring it within the rule announced in the case of *Baltimore & Ohio R. Co. v. Goodman,* 275 U. S. 66, wherein it is held, (48 Sup. Ct. Rep. 24) :

"Where, because his view of railroad tracks is obscured, a driver of an automobile cannot be sure otherwise whether a train is dangerously near, he must stop and get out of his vehicle, in addition to merely stopping and looking, and if he relies on not hearing train or signal, and takes no further precaution, he goes on crossing at his own risk."

In those jurisdictions where the rule contended for prevails it has its limitations and the courts in such jurisdictions have refused to apply the same in many instances on facts which were not as favorable to the party against whom they were invoked as they are in this case. Illustrations are given in a note on that subject in 56 A. L. R. 652, 653. Obviously, for the reasons heretofore stated, the rule contended for does not apply to the facts in this case.

The facts disclosed by the evidence are not such as warrant us in holding, as a matter of law, that decedent was guilty of such contributory negligence as would bar a recovery. It was for the jury to determine, from the evidence, whether the decedent exercised that reasonable care for his own safety that an ordinarily prudent man would have exercised under the existing circumstances and conditions.

Appellants assign as error that the evidence is insufficient to show that they were guilty of any negligence. The principal contention in that regard being that the accident did not happen at a public highway crossing; that the road was a private road, in that it was a *cul-de-sac* and traveled by only a limited number of persons, and that not being a public highway no duty was imposed upon the defendant railroad company by section 74-562, Comp. St. 1929, to have rung a bell or blown a whistle continuously in approaching said crossing with its train. That statute provides:

"A bell of at least thirty pounds weight, or a whistle shall be placed on each locomotive engine, and shall be

rung or whistled at the distance of at least eighty rods from the place where the railroad shall cross any road or street, and be kept ringing or whistling until it shall have crossed such road or street, under a penalty of fifty dollars for every neglect, to be paid by the corporation owning or operating the railroad, and also be liable for all damages which shall be sustained by any person by reason of such neglect."

We construed that statute in the case of the *Chicago, B. & Q. R. Co. v. Metcalf,* 44 Neb. 848, wherein we held that the statute "requiring that a bell shall be rung or a steam whistle sounded by locomotives at a distance of at least eighty rods from the place where a railroad shall cross any other road, etc., applies as well to roads in fact used by the public though not dedicated as public highways as to those so dedicated."

In that case as in this it was contended that the statute was limited in its application to a crossing over a public highway, and in answer to such contention, in the opinion by Judge Irvine, it is said:

"We do not think the statute should be given so narrow an application. Some courts have held that such a statute is in derogation of the common law, and therefore the subject of strict construction, but we think in most of the cases where such statutes have been confined in their application to public highways, the language of the statute was such as evidently to call for such restrictions. The object of the law was plainly to afford ample warning to persons near the railroad at points where they were probably about to cross as trains approached."

That case was decided before the day of automobiles and we see no reason now, when travel upon all highways and roads has increased many fold, owing to the extensive use of automobiles, to narrow and restrict the application of the statute.

There is no evidence showing that the road was a regularly laid out or dedicated public highway. The question is: Was it a road in fact used by the public? That the

road was traveled by only a limited number of persons is not important in determining the question involved. The important question is: Was it open to all who desired to use it? If so, it was a road in fact although it might accommodate only a limited portion of the public, or though it might accommodate some individuals more than others. 13 R. C. L. 16, sec. 4. While a public highway *prima facie* imports the way from one public place to another it may nevertheless be a *cul-de-sac. Warner v. Cavey,* 94 Neb. 778; 13 R. C. L. 14, sec. 2. The evidence shows that the crossing over the road was constructed in the same manner as other public crossings over country highways.

Applying the rule announced in *Chicago, B. & Q. R. Co. v. Metcalf, supra,* we hold that the evidence establishes that the road in question was a road in fact used by the public, although not laid out and dedicated to the public use, and that the place where the movement of the train started toward the crossing being eighty rods or less from the crossing, it was the duty of the defendant railroad company to ring the bell or blow the whistle continuously as it approached the crossing.

A finding that the statutory signal was not given as the train approached the crossing would warrant a finding that the failure to give said signal was the proximate cause of the collision and death of plaintiff's intestate.

In this connection counsel for appellants urge that the evidence shows that the bell was rung as required by the statute. Upon this question the evidence is conflicting and presented a question for the jury to determine. *Campbell v. Union P. R. Co.,* 100 Neb. 375.

There is also evidence that there was no conspicuous light on the end of the lead car that could be seen from the direction in which it was moving to warn persons of the approach of the train. Ordinarily it would be the duty of the railroad company, after dark, to have such a light so placed on the end of the lead car that it would warn persons of the approach of the train. See note, 15 A. L. R. 1527, 1528.

The questions whether, under the circumstances disclosed by the evidence, there should have been a light on the end of the lead car so that it could be seen from the direction in which the train was moving, and whether the lantern held by the brakeman at the place on the lead car shown by the evidence was a sufficient light for that purpose, were properly questions for the jury to determine, in determining whether defendants were guilty of actionable negligence in that regard.

We hold that on the questions of negligence and contributory negligence the facts in this case are such that different minds may reasonably draw different conclusions therefrom and were for the jury and not for the court to determine. *Hair v. Chicago, B. & Q. R. Co.*, 84 Neb. 398; *Lieb v. Omaha & C. B. Street R. Co.*, 119 Neb. 222; *Wortman v. Zimmerman*, 119 Neb. 682.

The appellants assign as error the giving of instruction No. 2 by the court, and the refusal to give instruction No. 4, requested by the defendants. One of the acts of negligence alleged was that there was no "person * * * on the crossing, to warn travelers upon said highway of the approach of said train to said crossing." By instruction No. 2 the court submitted that act of alleged negligence to the jury as one on which they might find a verdict against the defendants. On behalf of appellants it is contended there is no evidence that warranted the submission of that issue to the jury and that instruction No. 4, requested, withdrawing such issue should have been given.

We have no statute that requires the placing of a flagman or watchman at railroad crossings. The law seems to be well established that, in the absence of statutory regulation requiring it, the failure of a railroad company to have a flagman or watchman at a crossing will not warrant a jury in finding negligence on the part of the railroad company, unless there is evidence that such crossing is rendered more than ordinarily hazardous and dangerous by the conditions surrounding the same, and that the ordinary signals may be ineffective to warn travelers of the

approach of a train. *Grand Trunk R. Co. v. Ives*, 144 U. S. 408; *Glanville v. Chicago, R. I. & P. R. Co.*, 190 Ia. 174; *Hubbard v. Boston & A. R. Co.*, 162 Mass. 132; 52 C. J. 202; 22 R. C. L. 1008, sec. 238.

The defendant railroad company had no person at the crossing to warn travelers of the approaching train. There is nothing in the evidence to indicate that the crossing was more than ordinarily hazardous and dangerous, nor anything in the conditions surrounding the same that might render the giving of the ordinary signals ineffective to warn travelers of the approach of a train. The crossing was not much used by travelers, in fact it appears that the trainmen, in the years that they had been over the crossing at night, had never seen an automobile approaching the same until they saw decedent's car.

In the case of *Glanville v. Chicago, R. I. & P. R. Co.*, *supra.*, in which one of the grounds of negligence was the failure of a railroad company to have a flagman or watchman at a crossing over a public highway, that court held, under a state of facts much stronger than are shown here, that the evidence was insufficient to carry that issue to the jury.

The evidence was insufficient to warrant the submission of that ground of negligence to the jury. It is manifest the submission of such issue to the jury was error prejudicial to the defendants, and calls for a reversal.

Error is assigned in the giving of instructions No. 1 and No. 2, in which the court, on its own motion, submitted to the jury the issues as to whether the train was moving at a high and dangerous rate of speed, and whether there was any one on the lead car. Both of those acts of negligence were withdrawn from the jury by instructions No. 4 and No. 5, given at the request of the defendants. While the instructions are conflicting, yet it does not seem probable that the jury were misled thereby to the prejudice of the defendants. While the practice is not to be commended of submitting an issue in one instruction and then withdrawing it in another, yet where we are satisfied that

the jury were not misled thereby, a reversal will not be predicated thereon. As this is not likely to occur on a retrial we give the question no further consideration.

On the petition of the defendant railroad company, this case was removed from the district court for Cass county to the district court of the United States for the District of Nebraska, Lincoln Division. The petition for removal alleged, as grounds therefor, diversity of citizenship, separable controversy, and the fraudulent joinder of the defendant railroad company with the defendant H. F. Kilmer. On a motion to remand evidence was taken, the motion sustained and the case remanded. The federal district court sustained the motion on the ground that there was a joint liability alleged, and that the joinder of the defendant Kilmer with the defendant railroad company was not fraudulent. It is contended that the federal court erred in remanding the case to the district court and that said court was without jurisdiction to hear and determine the case. Under the federal practice an order of a federal district court remanding a case removed thereto from the state courts is not subject to review either directly or indirectly, but is final and conclusive. *Pacific Live Stock Co. v. Lewis,* 241 U. S. 440; 23 R. C. L. 831, sec. 200. The rule is that, where a federal court has remanded to the state court a cause theretofore removed therefrom, no state court has power on appeal or otherwise to review such an order of the federal court. *Fitzgerald v. Fitzgerald & Mallory Construction Co.,* 44 Neb. 463; 54 C. J. 375. "By an order of remand the state court is reinvested with jurisdiction and may rightfully proceed as though no removal had ever been attempted." 23 R. C. L. 832, sec. 201. The order of remand of the federal district court to the district court for Cass county is final and conclusive and is not subject to review by this court, and such order reinvested that court with jurisdiction and with the right to proceed as though no removal had ever been attempted.

For the error heretofore pointed out, the judgment is reversed and cause remanded for a new trial.

REVERSED.