ANNA GIFFORD, ADMINISTRATRIX AD PROSEQUENDUM AND GENERAL ADMINISTRATRIX OF SYDNEY GIFFORD, DECEASED, APPELLANT, v. PENNSYLVANIA RAILROAD COMPANY ET AL., RESPONDENTS.

PEARL A. GRAVATT, ADMINISTRATRIX AD PROSEQUENDUM OF GEORGE H. GRAVATT, DECEASED, RESPONDENT, v. PENNSYLVANIA RAILROAD COMPANY ET AL., APPELLANTS.

Submitted October 28, 1937—Decided January 26, 1938.

For the plaintiffs below, *Robert V. Carton* and *J. Victor Carton*.

For the defendants below, *John A. Hartpence*.

The opinion of the court was delivered by

PARKER, J. The two cases arise out of a collision between a train and an automobile at a private crossing in Monmouth county, and were combined in one record, pursuant to section 4 of the Practice act of 1912 (*Pamph. L., p.* 377) and paragraph (b) of rule 211 of the Supreme Court. The deceased Gifford was the owner and driver of the automobile; the deceased Gravatt was a passenger, and was, as the jury could find, standing on the runboard of the car on the side away from the train. In the Gifford case, the trial court directed a verdict for the defendants, obviously on the ground of contributory negligence, as will presently appear. In the Gravatt case, a nonsuit and direction for defendant were both refused, and the case went to the jury, who found for the plaintiff. The general theory of the court submitting the Gravatt case to the jury was that negligence of the railroad servants was a jury question, and that as to contributory negligence, any such negligence of Gifford was not imputable to Gravatt and that it was for the jury to say whether Gravatt had been shown guilty of any act or omission to act in regard to his own safety which amounted to contributory negligence on his part.

Taking up the Gifford appeal first: we may assume that the railroad company owed him a duty of care at the crossing, and that there was a lack of care resulting in the accident. This phase of the case will be discussed more fully in connection with the Gravatt case. Suffice it to say at this point that the terrain was in general terms an open field, substantially level, and that the private road crossed the railroad, a single track line, about at right angles. It was about seven-thirty A. M. on April 27th, 1935, a Saturday. The weather was clear. On standard time, which according to the witness Halloway was in effect, the sun must have been over two hours high; on daylight time, over an hour. It is not entirely clear which time was in effect, but the point is of little consequence. There were no obstructions to the view in any direction except a few trees, not yet in leaf; telegraph poles; and some low banks of earth, in part incidental to the construction of a golf links which was going on, the banks in question looking as if designed to prevent golf balls rolling on the track. At one point there is a shallow cut; but the photographs marked in evidence on both sides are illuminating, and the evidence generally as to the terrain is in our view convincing that no one about to cross the track and looking for a train, as it would be his duty to do, could fail to see it in ample time to stop and avoid it, even though it was running at about sixty miles an hour. We see no need to go into the details of the evidence. Suffice it to say, that contributory negligence of Gifford was so clearly shown as to remove the matter from the control of the jury and place it in that of the court. It is not suggested that the statute of 1910 (*Pamph. L., p.* 490) applies, and probably not, as that act by its title is limited to crossings of public streets and highways, and as already observed, the road in question was a private crossing. The judgment in the Gifford case will be affirmed.

Turning to the Gravatt case: Gravatt, as we have said, was a passenger on Gifford's car. Both were employes of one Bennett, who owned the tract of land through which the railroad and the private road ran, and was adapting it for use

as a golf links. It is in evidence that the private road had been in a different place, and had been moved by the railroad company, which constructed the new crossing and was under a duty to maintain it pursuant to section 26 of the Railroad act (*Comp. Stat., p.* 4231) or perhaps under an old charter, which, however, was not put in evidence, but which doubtless contains similar provisions about crossings, as all the old railroad charters did. See for example, the charter of the Farmingdale and Squan Village Railroad Company, *Pamph. L.* 1867, *p.* 574 (at *pp.* 578, 579), § 9. The railroad in this case may be said, for practical purposes, to run from east to west, and the private road from south to north, crossing the railroad about four miles west of Manasquan. In the angle between the south side of the railroad and the east side of the private road was the fourteenth green of the golf links, still incomplete as we understand the matter. Gravatt was on or near that green, on foot. Gifford, driving his car alone, stopped at the green and as a result of a short conversation told Gravatt to get on the automobile and he would take Gravatt to the club house, a short distance away on the other side of the track. Gravatt, on the left runboard, as already stated, was in a position where his view of a train to the east was necessarily somewhat obstructed; but like any other passenger, he was entitled to rely on the driver exercising due care. He was also in a place where if danger suddenly impended, he would be obliged to decide instantaneously whether to stay on the automobile or jump off, or perhaps take some other action. What happened was, that with the train in plain sight, Gifford undertook to cross the track, the automobile was struck squarely amidships on the right side, and both men were killed.

The case is submitted on briefs. For the railroad the first point made is that both men were trespassers or, at best, licensees as to the railroad, and that the company owed them no duty of care. We deem this entirely without substance. By statute, the railroad was under a duty to provide and maintain that crossing as connecting the two parts of Bennett's land. Bennett was of course entitled to use it as of

right; and the same right naturally extended to persons in Bennett's employ in connection with his land. Requests to charge predicated on a contrary view were properly refused.

The next point made in the brief is that Gravatt was under a duty to exercise reasonable care for his own safety. Naturally that is true; but the real question is, what in law and fact was reasonable care under the circumstances? Under this point some seven requests to charge are reproduced in the brief, numbered 6, 9, 11, 20, 21, 25 and 30. Numbers 6, 20, 21 and 25 were sufficiently covered in the charge. Number 9 laid down specific items of duty on Gravatt's part, some of which, at least, would be for the jury. Numbers 11 and 30 if charged would have directed a verdict for defendant, on the ground, in one case, of contributory negligence, and in the other, of assumption of risk. Both were properly refused.

Point 3 as made in the brief reads as follows: "And regardless of whether or not in this case the negligence of Gifford, the driver, can be imputed to Gravatt, who, it seems to us, was not in a position to claim that it should not be imputed to him, there was still the duty on Gravatt to exercise care for his own safety. He could not simply rely on Gifford, and shut his eyes and close his ears, and take no precautions for his own safety." The general proposition just quoted is, we think, correct and, indeed, was expressly laid down in *Mittelsdorfer* v. *West Jersey and Seashore Railroad, 77 N. J. L.* 698, where it was said at page 700, "the fact that the plaintiff was a guest did not relieve her from exercising ordinary care." But this point was fully covered in the charge in the present case. Under point 3, however, defendant argues requests to charge Numbers 13, 26, 27, 28 and 29.

Number 13 is, in effect, that if the negligence of Gifford was the proximate cause of the accident, the plaintiffs (plural) cannot recover, &c.

Number 26 is that the entire negligence of Gifford is imputable to Gravatt.

Number 28 is to the same effect, as also Number 29.

All these were properly refused as the status of Gravatt as a guest or invited passenger was at least for the jury, and if

he was such, the defendant was not entitled to the instruction prayed.

Request Number 27 is predicated on the assumption of joint enterprise, as to which we think there is no proof, and hence the request was properly refused. *McGinley* v. *Winter,* 110 *N. J. L.* 540, cited in the appellant's brief.

Point 4 invokes the refusal of two requests to charge. The first is in substance that if previously defendant had "on other occasions" blown a whistle or rung a bell for this crossing, failure to do so on the particular occasion would not be negligence nor be a fact from which negligence could be inferred. The second is to the same effect. Both were properly refused. In *Wolcott* v. *New York and Long Branch Railroad Co.,* 68 *N. J. L.* 421, the Supreme Court held that "when a railroad company assumes to protect a highway crossing, by a flagman, it is responsible for injuries received at that crossing, by a traveler on the highway, which have resulted solely from the negligence of such flagman; and that responsibility exists notwithstanding that the company is under no legal obligation to so protect the crossing." That rule was approved by this court, incidentally in *Brown* v. *Erie Railroad Co.,* 87 *Id.* 487 (at *p.* 494); and expressly in *Passarello* v. *West Jersey and Seashore Railroad Co.,* 98 *Id.* 790. These cases relate to the voluntary employment of a flagman; but the same principle seems applicable to warning signals by bell or whistle. The court charged with care on this point, that unless there was a custom of giving such signals, known to the deceased Gravatt, the fact of such signals having been given but not uniformly, or without the knowledge of Gravatt, would not be effective. The defendant was entitled to no more than this.

Point 5 reads in the brief as follows: "And if other noises interfered with his hearing the approach of the train, then he was under the duty of exercising the greater precaution as he approached the tracks."

This in general terms may be conceded but the point does not discuss any ruling of the court and therefore need not be further considered.

Point 6 brings up two requests, Numbers 31 and 32, to the general effect that if the view was obstructed, the duty of observation was increased accordingly.

The vice of the requests is that each relates to both driver and passenger without discrimination, and consequently lays the same duty on the passenger as on the driver. In the leading case of Mittelsdorfer, *ubi supra,* the plaintiff, a passenger, did not look at all for the train (page 701) but the matter of her contributory negligence was held to be for the jury. In the case at bar there is no evidence as to whether Gravatt looked or not, and as he was killed, and no witness testified to seeing the actual collision, there remained simply the ordinary presumption of due care. So far at least as refers to the Gravatt case, the requests were properly refused as without any basis in the evidence. For all that appears, Gravatt may have been looking and have seen the train. His duty in that situation would depend on the circumstances and the probable necessity of making a decision in an emergency not of his own creation, whether to choose the risk of jumping off the car or of being struck by the train.

Point 7 invokes a request to charge, in effect, that as the obstructions to the view, claimed to exist, were not on the property of the defendant, there was no duty of defendant to take extra precautions because of them. To this, plaintiffs' counsel replies, and we think properly, that nowhere in the case, on the record or at the trial, until the request was proffered, was any such point raised. On the general duty of care, the charge was sufficiently favorable to the defendant. The general duty of reasonable care under all the circumstances was correctly charged. The court went even further, and charged that as the crossing was a private one, the statutory provisions relating to highway crossings did not apply. We see no error in the refusal to charge this request.

Point 8 as made in the brief, is that "the court erred in submitting to the jury for determination whether the defendants had discharged their duty of giving reasonable warning of the approach of the train, and in charging the jury that the defendants had such a duty other than to refrain from willfully or wantonly injuring the decedents."

The judge charged that there was no statutory duty to give audible signals; and this sufficiently complied with requests 1 and 15 reproduced in the brief under this point. He also qualified this as we have said above, *i. e.,* with regard to a custom; and as we have held, properly. Requests 7 and 14 were that the defendants owed no duty except to abstain from willful injury. As the decedents were legally entitled, as we have seen, to use the crossing, these requests were properly refused. There was a duty of care; and this being so, a multitude of exceptions merely pointed out in the briefs by numbers of pages and grounds of appeal, are without merit.

Point 9: refusal to charge that there was no competent evidence of a custom to whistle or ring for the crossing in question. There was such evidence.

Point 10 relates to a photograph, originally admitted expressly without objection as *P-9*. In general, it is identical with *P-8,* taken a week after the accident, and approximately one hundred and thirteen feet south of the railroad, about twelve to fifteen feet from the cup of the fourteenth hole. *P-9,* according to the testimony of the same photographer, was taken eleven months later, and also from a point one hundred and thirteen feet south of the track—the distance from the track where the automobile stopped to take up Gravatt. Comparison of the two pictures shows that they were taken from almost the same point. Over objection, but without exception, the court admitted testimony that the picture *P-9* showed a train some eight hundred feet east of the crossing; and the witness was allowed to mark the place of the train in the picture. He admitted that as *P-9* was earlier in the season (April 4th) the foliage was not quite so advanced as on May 4th of the previous year, when *P-8* was taken. The court struck it out; but later reinstated it over exception. As to this last, be it noted that the picture had been in evidence by consent since the beginning of the trial, the photographer being the fourth witness, and called after the formal testimony of the two widows, and the testimony of the witness Van Pelt as to the accident. Consequently if defendant had any grievance, it was in permitting Brown, the photographer,

to testify as to distances, visibility of a train, &c., and on this phase we find no valid objection followed up by a proper exception.

The foregoing we think covers all the substantial matters presented in the brief. We find no error calling for a reversal; and the judgment for defendant in the Gifford case, and that for plaintiff in the Gravatt case, are respectively, affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, PARKER, CASE, BODINE, DONGES, HEHER, PERSKIE, HETFIELD, DEAR, WOLFSKEIL, RAFFERTY, WALKER, JJ. 13.

*For reversal*—None.