512 F.2d 300
 Mary Ann KLOEWER, Special Administratrix of the State of
Joseph P. Kloewer, Deceased, Appellee,
v.
BURLINGTON NORTHERN, INC., a corporation, Appellant,
and
R. E. Reutzel Co., a corporation.
 No. 74-1399.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 10, 1974.
Decided March 12, 1975.
 
 Harry B. Otis, Omaha, Neb., for appellant.
 John E. North, Omaha, Neb., for appellee.
 Before LAY, STEPHENSON and WEBSTER, Circuit Judges.
 LAY, Circuit Judge.
 
 
 1
 This wrongful death diversity case tried under Nebraska law evolved from a fatal accident at a farm railroad crossing in Cass County, Nebraska. The Burlington Northern Railroad appeals an $80,000 verdict rendered against it. On appeal the railroad urges us to vacate the judgment on three grounds: (1) that the plaintiff's decedent, Joseph P. Kloewer, was guilty of contributory negligence as a matter of law sufficient to bar recovery under the Nebraska comparative negligence statute; (2) that the decedent was a trespasser or bare licensee to whom the railroad owed only the duty to avoid affirmative harm; and, alternatively, (3) that the trial court erred in instructing the jury that under Nebraska law the railroad had a duty to properly maintain the approaches to the private farm crossing for the benefit of the landowner and anyone, such as the decedent, who was on the landowner's property with his permission. We affirm the judgment of the district court.
 
 
 2
 The accident which resulted in the death of the plaintiff's husband occurred at approximately 11:45 a. m. on September 6, 1972, at a private farm crossing on the Burlington Northern railroad track near Oreapolis, Nebraska. Joseph Kloewer, a foreman for the R. E. Reutzel Construction Company, was driving a 1972 Ford pickup owned by his employer at the time of his death. The Reutzel Company was performing work on a Northern Natural Gas Company pipeline approximately 1/2 mile from the crossing. The land on both sides of the railroad track at that point was owned by a farmer, Virgil Stander. The only passage to the area where the work was being performed was a private road on Stander's property. Stander had given the decedent's employer permission to use the private road and crossing for access to that portion of the pipeline located on his property. The members of the train's crew gave an eyewitness account of the collision. According to the crew, when the train (composed of seven diesel engines and 88 freight cars) was approximately 3/4 of a mile from the crossing, they saw a white pickup truck cross the tracks in a northerly direction. When the train was approximately 300 feet from the crossing the same truck, moving in a southerly direction, came back onto the crossing. The lead engine struck it broadside. The train stopped about sixteen cars and seven engines east of the point of impact.
 
 
 3
 Testimony at trial demonstrated that work on the pipeline on Stander's property had been going on for five to six months prior to the accident. The Reutzel Company employees used the crossing frequently, at least several times a day, during that period. Approximately 20 workers were involved in the pipeline repair and, when trains passed, the crew members and the construction workers often exchanged greetings. Approximately eight to ten trains a day passed over the track. The railroad right-of-way was 120 feet wide, the grade from the north to the south was steep, and the plaintiff's evidence was that the weeds along the track had not been cut during 1972. In fact, several witnesses testified that the weeds were so high and so close to the track that it was necessary to drive a car onto the track to see a train approaching. At the time of the accident, the road on Stander's property was soft and had deep ruts in it.
 
 Contributory Negligence
 
 4
 The railroad claims that the decedent was guilty of contributory negligence more than slight as a matter of law and that recovery is thus barred by Nebraska's comparative negligence statute.[1] Contributory negligence is an affirmative defense under Nebraska law and the defendant has the burden of proving it. The general rule governing a motorist's conduct when approaching a railroad crossing in Nebraska is set forth in Milk House Cheese Corp. v. Chicago, B. & Q. R. Co., 161 Neb. 451, 73 N.W.2d 679 (1955):
 
 
 5
 It is the duty of a traveler on a highway, when approaching a railroad crossing, to look and listen for the approach of trains. He must look, where, by looking, he could see, and listen, where, by listening, he could hear, and if he fails without reasonable excuse to exercise such precautions, then he is guilty of contributory negligence more than slight, as a matter of law, and no recovery can be had for damages resulting from a collision with a passing train.
 
 
 6
 73 N.W.2d at 686.
 
 
 7
 See also Neusbaum v. Chicago & N. W. R. Co., 162 Neb. 754, 77 N.W.2d 299 (1956); Kepler v. Chicago, St. P. M. & O. R. Co., 111 Neb. 273, 196 N.W. 161, cert. denied, 265 U.S. 589, 44 S.Ct. 635, 68 L.Ed. 1194 (1923).
 
 
 8
 Nebraska has rejected the doctrine that a driver must stop, look and listen before going upon a crossing. As early as 1910 the Nebraska Supreme Court, upholding a plaintiff's verdict in a crossing case in Crabtree v. Missouri Pacific R. Co., 86 Neb. 33, 124 N.W. 932 (1910), observed:
 
 
 9
 The rule in this state is not that there is an absolute obligation upon a person crossing a railway track to stop, look, and listen before attempting to cross, but as laid down in the O. R. V. R. Co. v. Talbot, 48 Neb. 627, 67 N.W. 599, the duty of the traveler upon a public highway approaching a railroad crossing is to exercise ordinary care. "A party in going upon a railroad crossing without first listening and looking for the approach of a train, without a reasonable excuse therefor, * * * and if such failure to look and listen contributes to the party's injury, he cannot recover." The qualifying words, "without a reasonable excuse therefor," are of great significance in this connection. If, as in this case, the view of approaching trains is obstructed by freight cars standing near the crossing; if the traveler's attention is distracted by moving trains upon other tracks or by other sounds or sights; if no warning signals are given or lookouts stationed-it is a question for the jury as to whether or not the traveler exercised ordinary care.
 
 
 10
 124 N.W. at 936 (emphasis added).
 
 
 11
 In other Nebraska crossing accident cases it has also been held that, depending upon the circumstances involved, the question of a motorist's contributory negligence is one of fact for the jury. See Hall v. Union Pacific R. Co., 113 Neb. 9, 201 N.W. 678 (1924); Hook v. Payne, 109 Neb. 252, 190 N.W. 581 (1922). See also Brunk v. Chicago, B. & Q. R. Co., 207 F.2d 354 (8th Cir. 1953), where this court, applying Nebraska law, held the issue under the Nebraska comparative negligence statute to be one of fact for the jury. Thus, there is no per se rule of conduct which, if not met, bars recovery. Rather, each case must stand or fall on its own facts. In Chicago, B. & Q. R. Co. v. Beninger, 373 F.2d 854 (8th Cir. 1967), this court applied what it felt to be Nebraska law concerning the determination of contributory negligence:
 
 
 12
 This court in cases arising from Nebraska has likewise held:
 
 
 13
 "But if on all the evidence reasonable minds might fairly differ in their conclusion as to the existence of contributory negligence or as to its degree being more than slight in the circumstances, the question is for the jury to determine. * * *
 
 
 14
 " 'The test under Nebraska's comparative negligence statute is not based upon absolute degrees of negligence but rather upon a comparative test of the relative degrees of negligence between the parties.' " Hutchinson v. Fouts, 8 Cir., 349 F.2d 946, 951; Continental Can Co. v. Horton, 8 Cir., 250 F.2d 637, 644.
 
 
 15
 373 F.2d at 859.
 
 
 16
 The railroad's argument that recovery should be barred because the decedent's conduct amounted to more than slight contributory negligence as a matter of law misstates Nebraska law. Before determining that a plaintiff's negligence is a bar to recovery under the Nebraska comparative negligence statute, one must compare the plaintiff's conduct with that of the defendant.
 
 
 17
 As stated by the Nebraska Supreme Court in Ripp v. Riesland, 170 Neb. 631, 104 N.W.2d 246 (1960):
 
 
 18
 The words "slight" and "gross" as employed in the comparative negligence act of this state are comparative terms. The test the statute provides is not based upon absolute degrees of negligence but rather upon a comparative test of the relative degrees of negligence between the parties. The negligence of the plaintiff or defendant is not to be evaluated as slight, gross, or otherwise, standing alone. The criterion by which the degree of negligence of plaintiff is to be measured is the extent thereof by comparison with the negligence of defendant.
 
 
 19
 104 N.W.2d at 263.
 
 
 20
 See also Johnson v. Rouecke, 188 Neb. 716, 199 N.W.2d 1 (1972). Thus, evaluation of the decedent's conduct alone cannot serve as a proper criterion for a directed verdict under Nebraska law without a comparative evaluation of the defendant's conduct.
 
 
 21
 In the present case, there is little testimony as to what the decedent did before the fatal collision. The evidence revealed that he drove safely across the tracks several minutes before the collision in order to give a signal to his fellow workmen. He then apparently turned around and headed back across the track in the opposite direction. The evidence was that one could not see in the direction from which the train was approaching until completely on the tracks. This condition existed because of tall weeds on the railroad right-of-way. There was no evidence that the decedent failed to stop, that he failed to listen, or that he failed to look for any train within a zone of danger before proceeding onto the tracks. The jury was entitled to believe that the decedent did stop his truck and observe, as best he could, that area which he considered to be the zone of danger. In the absence of affirmative proof to the contrary the jury could also have found that the driver saw nothing within that zone of danger before he proceeded onto the track and that he was never aware of the fast-approaching train at any time. On the other hand, under the proven factual circumstances, a jury could have found that the decedent may have been guilty of some negligence in attempting to cross the track when his view was partially obscured.
 
 
 22
 In comparison to the decedent's conduct, there was affirmative evidence by the train crew, as well as by a speed recording device, that the train was exceeding the speed limit before and at the time of collision. There was controverted testimony that, even after the presence of the truck was known, the train crew failed to blow its whistle or ring its bell. There was some evidence that the train crew was not keeping a proper lookout for workmen using the crossing. Cf. Carter v. Chicago, B. & Q. R. Co., 175 Neb. 188, 121 N.W.2d 44 (1963). There was further evidence that the railroad made some effort to maintain the crossing but at no time cut the weeds which affected the view of those on the approaches.
 
 
 23
 We are satisfied that the conflicting evidence pertaining to the train crew's conduct and the decedent's actions raise the kind of questions to be resolved by a jury under the Nebraska comparative negligence statute. The preference for resolution by a jury in such instances was emphasized by the Nebraska Supreme Court very early in Wallenburg v. Missouri Pacific R. Co., 86 Neb. 642, 126 N.W. 289 (1910):The next inquiry concerns the plaintiff's negligence. Contributory negligence is but an inference to be deduced from primary facts. Individual minds frequently differ radically in drawing the conclusion of negligence from admitted or established facts, and the judgment of a layman not infrequently is as sound as the logic of a judge upon the subject. The questions of negligence and contributory negligence are therefore as likely to be wisely solved by a jury as by a court, and ordinarily should be committed to the tribunal provided by law for ascertaining litigated facts.
 
 
 24
 126 N.W. at 291.
 
 
 25
 A jury represents the mores of the community and draws from the combined common experiences of it members. Their composite judgment of what constitutes reasonable care and the comparative extent to which the conduct of each party meets that standard is far better than that of a single judge. We therefore conclude that the district court correctly refused to direct a verdict on the basis of contributory negligence.
 
 Duty of Due Care at Private Crossing
 
 26
 We turn now to the question of the duty owed by the railroad to the decedent. The railroad contends that since the farm road was a private crossing, the railroad owed a duty of reasonable care only to the landowner. It is argued that since the decedent was a trespasser or a bare licensee, the only duty the railroad owed to him was that of avoiding the intentional, wanton or willful infliction of harm. We disagree.
 
 
 27
 There are no Nebraska cases which specifically define the duty in cases involving private crossings. It would appear, however, that at common law the nature of the crossing was immaterial so that a railroad owed the same duty to exercise reasonable care at both private and public crossings. See 22 R.C.L. Railroads, § 233; 65 Am.Jur.2d, Railroads § 504. See also Johnston v. Delano, 175 Iowa 498, 154 N.W. 1013 (1915); Dickerson v. Terminal R. Ass'n, 284 S.W.2d 568 (Mo.1955). Cf. Atlantic Coast Line R. Co. v. Futch, 263 F.2d 701 (5th Cir. 1958), cert. denied, 360 U.S. 935, 79 S.Ct. 1456, 3 L.Ed.2d 1547 (1959). This is especially true where the railroad has undertaken a duty to maintain the crossing. As stated by the Pennsylvania Supreme Court:
 
 
 28
 While there does not appear to be any clear authority directly on this point we are of the opinion that in circumstances such as those presented by this case, regardless of whether the crossing is considered a private or a public one, the railroad, having undertaken to maintain the crossing in good repair, is under a duty to keep it reasonably safe for use by the public....
 
 
 29
 Pro v. Pennsylvania R. R. Co., 390 Pa. 437, 135 A.2d 920, 923 (1967).
 
 
 30
 In an early Nebraska decision the court held that the railroad owed a duty to exercise reasonable care on a private crossing, where the railroad had acquiesced in its use by members of the public. See McQuin v. Missouri Pacific R. Co., 122 Neb. 423, 240 N.W. 515 (1932).[2] In the present case, there was evidence from which the jury could have found that the railroad was aware of the use of the crossing by workmen over a 5-6 month period. The Reutzel crew (numbering over 20 men a day) used the crossing several times a day. The railroad was aware that the workmen were repairing a gas line, a portion of which even ran under the railroad track. We conclude in the present case that the railroad had a duty to exercise reasonable care towards all persons using the crossing. The question as to their status (trespasser, licensee, etc.) is immaterial, we believe, under Nebraska law given the facts at hand.[3]
 
 Statutory Duty
 
 31
 We now turn to the question of whether the trial court properly instructed the jury on the railroad's duty under the Nebraska private crossing statute. That statute reads as follows:
 
 
 32
 Crossings; private; construction. Whenever any person owns land on both sides of the right-of-way of any railroad, such railroad shall provide and keep in repair at least one adequate means for such landowner to cross the right-of- way. Any interested landowner with land on both sides of the right-of-way of any railroad, may file written complaint with the commission against any such railroad that the crossing is not adequate or is unsafe and dangerous to the life and property of those who use the same, and the commission thereupon shall make such investigation, hold such hearing as may be necessary, and shall issue such orders as it shall deem necessary, proper and adequate. If circumstances warrant, the commission may require overhead, underground, or grade crossings, and require wing fences at underground crossings, or may require existing crossings to be relocated so as to be safe to those who use them, but where such special crossing involves an expenditure of more than seven hundred dollars, the landowner shall bear one half the expenses in excess of seven hundred dollars.
 
 
 33
 Neb.Rev.Stat. § 75-413 (1943).
 
 The district court instructed:
 
 34
 You are further instructed that in this case, the defendant had a duty to provide and keep in repair the crossing and approaches within the right-of-way where the accident happened and that the duty was for the benefit of the landowner and anyone, such as the decedent, who was on the property with the landowner's permission.
 
 
 35
 Again, there are no Nebraska cases construing the statute. Cases from other jurisdictions interpreting similar statutes appear to be divided over whether or not the duty to maintain the crossing and approaches is solely for the landowner's benefit. See, for example, Johnson v. Chicago, M. & St. P. Ry. Co., 96 Minn. 316, 104 N.W. 961 (1905); Chesapeake & Ohio R. Co. v. Faison,, 189 Va. 341, 52 S.E.2d 865 (1949). Some states have construed similar statutes broadly and have extended the duty to include all persons who are entitled to use the crossing as a matter of right. See, e. g., Gifford v. Pennsylvania R. Co., 119 N.J.L. 397, 196 A. 679 (1938).[4]
 
 
 36
 There is language within the Nebraska statute which indicates a legislative intent against a narrow construction. The statute gives the landowner authority to file a complaint with the Commission when he feels the crossing is a danger to "the life and property of those who use the same." The statute further gives the Commission power to relocate crossings "so as to be safe to those who use them." It seems incongruous in construing this safety statute to argue that the purpose of the statute was to place upon the railroad a duty to construct and to keep the crossing safe for some people but not for others. Humane considerations of safety for life and limb must have a greater value than this. We believe the actual purpose of the statute is to evolve a duty upon the railroad to exercise reasonable care in maintaining a private crossing so as to protect people using the crossing.
 
 
 37
 We find two early Nebraska cases helpful in reaching this construction. In interpreting the predecessor statute to 75-413, the Nebraska Supreme Court observed:
 
 
 38
 It is true that it has been held that passageways for the passage of unattended livestock are not within the statute requiring railroads to provide farm crossings. Railroad Co. v. Severin, 30 Neb. 318, 46 N.W. 842. But that is immaterial. Crossings, whereby the farmer may drive his stock from one side to the other, are within the statute; and, if the railroad company can provide a free and safe subway, it may avoid the dangers attendant upon a grade crossing, or at least decrease its use and consequent dangers. Thus both railroad company and the public are protected from dangers incidental to railroad operation, Reichert v. Keller, 58 Neb. 178, 78 N.W. 381, 382 (1899).
 
 
 39
 In another early Nebraska case, Chicago, B. & Q. R. Co. v. Grablin, 38 Neb. 90, 56 N.W. 796 (1893), a nine-year-old boy was struck and killed by a train after he wandered onto an unfenced right-of-way in rural Nebraska. The Supreme Court found evidence of negligence in the violation of the fencing laws and reversed for a new trial since the trial court had refused to admit evidence on this point. The court said:
 
 
 40
 By the statutes of this state, railroad companies are required to fence their tracks, and while the main objects of this law are to protect stock running at large and increase the safety of passengers on railway trains, yet the fencing of their tracks by railroad companies is a positive duty enjoined upon them by law. It is in the nature of a police regulation, and their failure to obey the statute is negligence. In the case at bar the administrator, to recover by reason of the failure of the railroad company to effect fences, must have proven that his intestate's death was caused by such negligent omission of the railroad company.
 
 
 41
 56 N.W. at 797.
 
 
 42
 Thus, although the statute in question spoke only of a duty to fence out livestock, the court interpreted it as a general safety regulation. This interpretation was affirmed in dicta as recently as 1964 in Linebrink v. Chicago & N. W. R. Co., 177 Neb. 838, 131 N.W.2d 417, 420 (1964). We find no error in the instruction of the district court.
 
 
 43
 We conclude that the issues of negligence and contributory negligence were properly submitted to the jury, that under Nebraska law the railroad owed a duty to the decedent to exercise reasonable care at the private crossing since the user was lawfully on the crossing, and that the trial court properly instructed the jury under Nebraska law.
 
 
 44
 Judgment affirmed.
 
 
 
 [1]
 The Nebraska comparative negligence statute, Neb.Rev.Stat. § 25-1151 (1964), provides:
 In all actions brought to recover damages for injuries to a person or to his property caused by the negligence of another, the fact that the plaintiff may have been guilty of contributory negligence shall not bar a recovery when the contributory negligence of the plaintiff was slight and the negligence of the defendant was gross in comparison, but the contributory negligence of the plaintiff shall be considered by the jury in the mitigation of damages in proportion to the amount of contributory negligence attributable to the plaintiff; and all questions of negligence and contributory negligence shall be for the jury.
 
 
 [2]
 The Nebraska Supreme Court observed:
 There is no evidence showing that the road was a regularly laid out or dedicated public highway. The question is: Was it a road in fact used by the public? That the road was traveled by only a limited number of persons is not important in determining the question involved. The important question is: Was it open to all who desired to use it? If so, it was a road in fact although it might accommodate only a limited portion of the public, or though it might accommodate some individuals more than others. 13 R.C.L. 16, § 4....
 Applying the rule announced in Chicago, B. & Q. R. Co. v. Metcalf, supra (44 Neb. 848, 63 N.W. 51), we hold that the evidence establishes that the road in question was a road in fact used by the public, although not laid out and dedicated to the public use, and that the place where the movement of the train started toward the crossing being eighty rods or less from the crossing, it was the duty of the defendant railroad company to ring the bell or blow the whistle continuously as it approached the crossing.
 McQuin v. Missouri Pacific R. Co., 122 Neb. 423, 240 N.W. 515, 520 (1932) (emphasis added).
 
 
 [3]
 An early Nebraska case further strongly suggests that the safety of the public is a proper legislative concern on farm crossings as well as on public crossings. In Holmberg v. Chicago, St. P., M. & O. R. Co., 115 Neb. 727, 214 N.W. 746 (1927), rev'd on other grounds, 282 U.S. 162, 51 S.Ct. 56, 75 L.Ed. 270 (1930):
 (T)he source of the state's authority to adopt regulations for public safety at grade crossings is the police power of the state, and that the elimination of grade crossings, is within the scope of that power. The fundamental fact upon which its existence is justified is that its exercise promotes the safety of either or both of two distinct classes: (1) The passengers transported by the railways; and (2) travelers proceeding over the "intersected way". These considerations apply to "farm grade crossings". It must be conceded that each of these, in greater or less degree, is a place of potential danger. Indeed, some farm crossings, because perils upon the public there in course of transportation, as well as upon persons and property on the premises where situated, than such as are incidental to usual grade crossings upon public highways.
 
 
 [214]
 N.W. at 749-750
 
 
 [4]
 As the New Jersey court observed in Gifford:
 By statute, the railroad was under a duty to provide and maintain that crossing as connecting the two parts of Bennett's land. Bennett was of course entitled to use it as of right: and the same right naturally extended to persons in Bennett's employ in connection with his land. Requests to charge predicated on a contrary view were properly refused.
 
 
 [196]
 A. at 681