John D. MELIA, Special Administrator of the Estate of Pearl Lorraine Norgaard, Deceased, Appellee,

v.

FORD MOTOR COMPANY, a corporation, Appellant.

No. 75–1316.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 8, 1975.

Decided April 20, 1976.

Rehearing and Rehearing En Banc Denied May 20, 1976.

C. L. Robinson, Omaha, Neb., for appellant; Lyle J. Strom, Omaha, Neb., filed brief.

Martin A. Cannon, Omaha, Neb., for appellee.

Before LAY, BRIGHT and HENLEY, Circuit Judges.

LAY, Circuit Judge.

This is an appeal from a jury verdict in favor of the Special Administrator of the Estate of Pearl Lorraine Norgaard against the Ford Motor Company. The suit was a wrongful death action based on a product liability claim for strict liability under Nebraska law. The decedent died as a result of injuries received in a two-car collision on February 11, 1971 at the intersection of 90th Street and Military Road in Omaha, Nebraska. Her automobile was struck on the left front door and she was thrown from the car. Her suit against Ford was based on an alleged design defect in the left door latch assembly of the 1968 Ford Mustang in which she was driving at the time of the accident.

The jury returned a verdict for $55,000. The district court, the Honorable Albert G. Schatz presiding, overruled defendant's motion for new trial and in the alternative a motion for judgment notwithstanding the verdict. This appeal followed, in which Ford urges (1) the trial court erred in not directing a verdict for the defendant on the ground that the Ford automobile was reasonably safe as a matter of law; (2) that the trial court erred in failing to instruct the jury that they must consider whether the auto as a whole was defective and unreasonably dangerous; and (3) that the trial court failed to admit evidence that the decedent was driving at an excessive rate of speed, 60 miles per hour, and ran a red light. We affirm the judgment of the district court.

Nebraska law, of course, controls. In *Friedrich v. Anderson*, 191 Neb. 724, 217 N.W.2d 831 (1974), the Nebraska Supreme Court considered the automobile manufacturer's duty to avoid unsafe design, and stated:

> We . . . hold that a manufacturer of goods has a duty to use reasonable care in the design of goods to protect those who will use the goods from unreasonable risk of harm while the goods are being used for their intended purpose or any purpose which could be reasonably expected. *The subjection of an automobile to accidental collision* with another automobile or object while being used for its intended purpose *is a use which a manufacturer should reasonably expect.*

217 N.W.2d at 836 (emphasis added).

*See also Kohler v. Ford Motor Co.,* 187 Neb. 428, 191 N.W.2d 601 (1971). *Cf. Larsen v. General Motors Corp.,* 391 F.2d 495 (8th Cir. 1968).

■ This rule, of course, was not intended to make the manufacturer an insurer of the safety of the automobile's occupants under all circumstances.[1] Thus, in *Fried-*

---

1. The doctrine of "crashworthiness", which has become the standard defense in suits against automobile manufacturers, has little relevancy when, in enhanced injury cases, the cause of the second injury is a defect or malfunction of the auto. If the law imposed liability for collision injuries in the absence of a defect or malfunction of the auto, then and only then would the manufacturer become an insurer. *Cf.* Hoenig & Weber, *Automobile "Crashworthiness": An Untenable Doctrine,* 1971 Ins.L.J. 583. "Crashworthiness" has similarly been defined as "the relative ability of an automobile to protect its passengers during the second collision". Note, *Liability for Negligent Automobile Design,* 52 Iowa L.Rev. 953, 958 (1967).

Once a defect causing a second injury is shown, then the issues remaining are whether the defect is unreasonably dangerous and whether the risk is foreseeable. As emphasized in *Dreisonstok v. Volkswagenwerk, A. G.,* 489 F.2d 1066 (4th Cir. 1974):

> The key phrase in the statement of the *Larsen* rule is "*unreasonable risk* of injury in the event of a collision", not foreseeability of collision. The latter circumstance is assumed in collision cases under the *Larsen* principle; it is the element of "unreasonable risk" that is uncertain in such cases and on which the determination of liability or no liability will rest. It would patently be unreasonable "to require the manufacturer to provide for every conceivable use or unuse of a car." Nader & Page, Automobile Design and the Judicial Process, 55 Cal.L.Rev. 645, 646. Liability for negligent design thus "is imposed only when an unreasonable danger is create⌐. Whether or not this has occurred should be determined by general negligence

*rich* the Nebraska Supreme Court found that a design of a gear shift knob, which the driver hit upon colliding with another car, did not create a foreseeable and unreasonable risk of harm. The court said:

> [W]henever a "second impact" or enhanced injury occurs, this should not be an open invitation to a jury to speculate as to the issue of foreseeability or the unreasonableness of the risk of harm. This is no different than in any other tort case in which there is always the preliminary question of law for the court "not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the burden of proof is imposed."

217 N.W.2d at 836, *quoting Langemeier, Inc. v. Pendgraft*, 178 Neb. 250, 132 N.W.2d 880 (1965).

■ An analysis of the record here reveals sufficient evidence of unsafe design creating a foreseeable and unreasonable risk of harm. Two well qualified professional engineers testified for the plaintiff that the door latch deviated from safety engineering practice and was not protected from horizontal external forces which could release the latch. In their opinion the collision to the car had only a "brushing" horizontal effect on the door and the latch had no "fail-safe" mechanism to prevent the car door from flying open.[2]

Mr. Egerer, one of the plaintiff's engineers, testified that the door latch was designed in such a manner that it would open upon *very slight impact.*[3] Using visual exhibits, he showed the trial court and the jury the door latches used on the 1968 Lincoln, Ambassador, Plymouth and Chevrolet. Each of these latches in his opinion contained a fail-safe mechanism, unlike the 1968 Mustang. Both Mr. Egerer and Mr. Klein, plaintiff's other expert, testified that the design involved did not conform to accepted engineering standards.

Ford's engineer, Mr. Tiede, disagreed and opined that the latch was fail-safe since the door would not open when the inside door lock was depressed. His primary disagreement with plaintiff's experts, however, concerned the manner in which the collision occurred and the force exerted on the latch causing the door to open.

Defendant's argument is that the defect did not, as a matter of law, create a foreseeable and unreasonable risk of harm. We cannot agree. Ford's expert acknowledged that automobile manufacturers' research facilities have long been concerned with safe door latch design.[4] National safety figures and a study performed by the National Safety Council were offered to show

principles, which involve a balancing of the likelihood of harm, and the gravity of harm if it happens against the burden of the precautions which would be effective to avoid the harm." In short, against the likelihood and gravity of harm "must be balanced in every case the utility of the type of conduct in question."
489 F.2d at 1071.

2. Mr. Egerer stated:
> This particular design does not fail safe because a horizontal force coming in onto the edge of the lever will produce an upward component because the contact point is above the pivot point of the lever, thus forcing the lever in an upwardly direction, which will cause the door latch to unlatch. This is the unsafe condition. Now a fail safe condition would have this lever and the contact point at which the red plastic bushing is located below the pivot point so that a horizontal force coming into the lever would force the lever down, either bend it, force it

down, but there would be no action in the door latch assembly because the lever has to be pulled up in order to unlatch the door, and if this contact point is below the center line of this pivot point, the lever would not be forced up, but rather forced down and the door latch assembly would not unlatch.

3. He analyzed the impact on the Mustang's door as follows:
> [I]t was indeed a brushing impact, confined in the door to sheet metal damage mostly, and because the whole skin or door did not shift in a lateral direction, the net force on the lever of the door latch was an inward, horizontal force, although the outside was a brushing, glancing force at an angle; the resultant force on the inside was horizontal.

4. Cf. *Bair v. American Motors Corp.*, 473 F.2d 740 (3rd Cir. 1973), noting that studies have been made for many years concerning the relationship of passenger ejectment and faulty door latch mechanisms.

the increased probability of fatalities when passengers are ejected in auto accidents. For this court to rule that a jury could not find an unreasonable risk of harm from a car door opening upon slight impact, would require us to ignore the record as well as common experience.

As the risk of injury increases, so does the manufacturer's responsibility to exercise care in safely designing the product. The reasonableness of the risk of harm from the design of a certain door latch in an automobile is far removed from the reasonableness of the increased risk of harm from an undersized gear shift knob discussed briefly in the *Friedrich* case. The foreseeable risk of harm from hitting a particular size gear shift knob is no greater upon collision than hitting any other object within a car. However, the foreseeable risk of harm when a car door opens from a brushing horizontal impact on the door is much greater than when the door remains closed.

In the present case, the evidence showed that the door opened and closed freely and the window was fully operable after the collision. The only reason the door would not remain closed after the accident was that the door latch no longer worked. If the door opened due to a *violent* collision with the car then the proximate cause of the fatality was the collision and not the defective latch. If, on the other hand, the door opened following a slight impact on the door due to the lack of a fail-safe mechanism, a contributing cause of the fatality was the door latch design. This was a question for the jury to resolve from the conflicting testimony—not the court.[5] Obviously, the jury believed the plaintiff's version of how the accident happened and the evidence strongly corroborates this version.

The likelihood and the gravity of harm when a door latch of an automobile opens upon collision must be balanced against the burden of requiring the manufacturer to design so as to avoid the risk. It is clear that the plaintiff has stated a submissible claim of foreseeable and unreasonable risk of harm.

■ The trial judge considered defendant's motion for a directed verdict and on the strength of the evidence had little difficulty disposing of it. Although this court is not bound by a trial judge's interpretation of state law, we nonetheless give it special weight in diversity cases. *Sherrill v. Royal Industries, Inc.*, 526 F.2d 507, 510 (8th Cir. 1975); *Luke v. American Family Mutual Insurance Co.*, 476 F.2d 1015, 1019 (8th Cir.), cert. denied, 414 U.S. 856, 94 S.Ct. 158, 38 L.Ed.2d 105 (1973). Furthermore, in the federal courts, we have been admonished that before a judge should deprive a litigant of a jury determination there must be "a complete absence of probative facts to support the conclusion reached . . . ." *Lavender v. Kurn*, 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916, 923 (1946). It is impossible to fairly appraise the record in this light.

■ The trial court instructed that if the jury found that in failing to wear the seat belt or lock the door, the decedent misused the product or assumed the risk of injury, recovery would be barred. The jury was properly allowed to pass on these issues. On this record, the defendant is in no position to assert that the court erred in failing to rule in its favor as a matter of law. *Cf. Hoppe v. Midwest Conveyor Co.*, 485 F.2d 1196 (8th Cir. 1973).[6]

The intended use doctrine necessarily includes foreseeable consequences of misuse. With hindsight one might conclude that the decedent would not have been fatally in-

---

5. This is not the first case involving safe design of an automobile door latch. Similar claims have been recognized under Pennsylvania and Oklahoma law. *See Bair v. American Motors Corp.*, 473 F.2d 740 (3rd Cir. 1973) (applying Pennsylvania law); *Walker v. International Harvester Co.*, 294 F.Supp. 1095 (W.D.Okl. 1969) (applying Oklahoma law).

6. We need not pass on the propriety of submitting as evidence of assumption of risk and misuse the defenses pled: failure to push down the door lock and failure to wear a seat belt. Instructing upon these defenses could only be prejudicial to the plaintiff. The fact is, they were submitted to the jury, at defendant's request and the jury obviously rejected them.

jured had she used her seat belt or locked the door. However, one cannot say as a matter of law that such conduct of an automobile user was not reasonably foreseeable. There is no evidence that the decedent knew that the door latch was defectively designed or was aware of the danger that it might open, upon collision, if the door was not locked. Thus it cannot be argued that the defect was discovered and the product unreasonably used after the discovery of the defect. Foreseeable use includes any particular use which should be known to a reasonably prudent manufacturer. The issue of the defective condition of the automobile was clearly one of fact for the jury.

■ Defendant's second contention is that the court failed to properly instruct the jury that they must consider whether the auto *as a whole* was defective and unreasonably dangerous. This claim overlooks the tenor of the trial court's overall instructions. The trial court made clear throughout the instructions that the defect must

have made *the automobile* unsafe for the reasonable use contemplated.[7]

Defendant's last contention is that the trial court erred in excluding proof that the decedent entered the intersection against a red light and at an excessive speed. The argument is that the trial court should have allowed such testimony as evidence of contributory negligence and instructed upon the comparative negligence statute under Nebraska law.

■ The record above shows no foundation for the admission of the speed of decedent's automobile. The driver of the other auto did not observe her car until he was in the intersection, at which time the decedent appeared immediately in front of his vehicle. The district court sustained the objection, in part on the ground of improper foundation. We agree with that ruling.

The remaining issue is whether the trial court erred in excluding evidence that the decedent entered the intersection on a red

7. Instructions 5 and 6 read:

Instruction No. 5

The burden of proof is upon the Plaintiff, to prove by a preponderance of the evidence, the essential elements of the cause of action before the Plaintiff may recover in this action and have a verdict in his favor. The essential elements which the Plaintiff must prove, by a preponderance of the evidence, to entitle him to recover herein are as follows:

1) The Defendant placed the 1968 Ford Mustang automobile in question on the market for use, and the Defendant knew, or in the exercise of reasonable care, should have known, that the automobile would be used without inspection for defects in the left door latch assembly.

2) The left door latch assembly was in a defective condition at the time it was placed on the market and left the Defendant's possession.

3) The Plaintiff's decedent was unaware of the extent and nature of the claimed defect.

4) The claimed defect in the design of the left door latch assembly was the proximate cause or a proximately contributing cause of the accident and any injury to the Plaintiff's decedent occurring while the automobile was being used in the way and for the general purpose for which it was designed and intended.

5) The defect, if it existed, made the automobile unreasonably dangerous and unsafe for its intended use;

6) Plaintiff's decedent sustained damages as the direct and proximate result of the claimed defect.

7) The nature, extent and amount of the damages thus sustained by the Plaintiff, if any.

If from the evidence you find that the Plaintiff has failed to prove, by a preponderance of the evidence, any one or more of the above essential elements, your verdict will be for the Defendant. If, however, you find from the evidence that Plaintiff has proved the above elements, you will then consider the defenses of the Defendant.

Instruction No. 6

You are instructed that a manufacturer who knows, or as a reasonable and prudent person should know, that its product involves unreasonable danger to users, has a duty to give warning of such dangers, whether or not the person using the product was the original purchaser. This duty to give a warning is as to the dangers inherent or reasonably foreseeable in using the chattels in the manner specified. This duty applies even though chattels may not be used in their specified manners, so long as such use is one that the manufacturer should reasonably foresee. However, there is no duty to warn as to dangers that are obvious or known, or that should be known to anyone using the product with reasonable care.

light. One could infer that the decedent entered the intersection on the red light (even though plaintiff might argue that she did not) from the testimony of the other driver that he entered on a green light.[8]

Thus, we must decide whether evidence of contributory negligence is relevant in a product liability case based on strict liability under Nebraska law. We are aware that many decisions exclude evidence of contributory negligence in similar cases, limiting the issues to misuse and assumption of risk. Cf. *Hoppe v. Midwest Conveyor Co.*, 458 F.2d 1196 (8th Cir. 1973) (applying Missouri law). We are also aware of cases holding to the contrary. *See, e. g., Oltz v. Toyota Motor Sales*, 531 P.2d 1341 (Mont.1975). Nonetheless, it is not for us to choose the law we think more rational or wise, nor is there need to discuss policy in diversity cases; we are not concerned as to why a state applies a certain rule. When faced with a diversity question, we must apply the law as determined by the highest court of the state. In this case we look only to the decisions of the Nebraska Supreme Court.

Nebraska adopted the doctrine of strict liability in product liability cases in *Asher v. Coca Cola Bottling Co.*, 172 Neb. 855, 112 N.W.2d 252 (1961), and then expanded it to all products in *Kohler v. Ford Motor Co.*, 187 Neb. 428, 191 N.W.2d 601 (1971). Subsequently, in *Hawkins Const. Co. v. Matthews Co.*, 190 Neb. 546, 209 N.W.2d 643 (1973), the Nebraska Supreme Court observed:

> It is clear that traditional "contributory negligence" in the sense of a failure to discover a defect or to guard against it, is not a defense to a suit in strict tort, or

for a breach of warranty. Assumption of risk and misuse of the product are.

209 N.W.2d at 655.

As authority the court cited comments to the Restatement (Second) of Torts § 402A. The comments state, in part:

> Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence. On the other hand the form of contributory negligence which consists in *voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense under this Section as in other cases of strict liability.*

Restatement (Second) of Torts § 402A, comment *n* at 356 (1965) (emphasis added).

■ Clearly, there is no evidence that the decedent's alleged conduct of entering an intersection on a red light was intentional rather than inadvertent. The defense of assumption of risk under Nebraska law "applies to *known dangers* and not to those things from which, in possibility, danger may flow." *Hickman v. Parks Const. Co.*, 162 Neb. 461, 76 N.W.2d 403, 411 (1956) (emphasis in original). The distinction between assumption of risk and contributory negligence was examined in *Landrum v. Roddy*, 143 Neb. 934, 12 N.W.2d 82 (1943), where the Nebraska Supreme Court said:

> Assumption of risk under the maxim "volenti non fit injuria" involves a choice made more or less deliberately and negatives liability without reference to the fact that the plaintiff may have acted with due care, whereas, the defense of

---

**8.** Plaintiff sought recovery from the other driver in state court and a jury denied recovery. On appeal, plaintiff similarly urged that there was no evidence of contributory negligence by the decedent driver and that it was error to so instruct the jury. The Nebraska Supreme Court considered the same evidence and said:

> The basis for the contention on the contributory negligence issue is that there was no affirmative testimony to establish negligence on the part of the decedent. The latter con-

tention disregards the fact that there is ample physical evidence from which the jury could have and obviously did infer the decedent's negligence.

> . . . The evidence is uncontradicted that the defendant was proceeding through the intersection with the green light and the corollary inference must follow that the decedent was proceeding against a red light.

*Melia v. Svoboda*, 191 Neb. 150, 214 N.W.2d 476, 477 (1974).

contributory negligence implies the failure of the plaintiff to exercise due care. 12 N.W.2d at 89.

Judge Schatz instructed the jury:

You are instructed that the defense of negligence or contributory negligence on the part of the Plaintiff's decedent is not available to the Defendant in this type of action which is based on products liability in the manufacture of a chattel. You are instructed, however, that the defenses of assumption of the risk or misuse of the product are separate from negligence or contributory negligence and, therefore, you are to consider the defenses of assumption of the risk or misuse of the product.

■ In view of the overall status of Nebraska law at this time we cannot say the trial court reached an interpretation of the law on this issue which is in conflict with Nebraska law on strict liability. We reaffirm what this court said in *Sherrill v. Royal Industries, Inc.,* 526 F.2d 507 (8th Cir. 1975):

[I]n the absence of authority to the contrary, it is not the duty of this court to instruct the Nebraska Supreme Court on the doctrinal path it should follow. We have simply concluded that the instruction . . . in this case is a reasonable interpretation of Nebraska law that will not be set aside absent a showing that it is erroneous.

526 F.2d at 513.

■ We additionally observe the application of the Nebraska comparative negligence statute would, under the language of the statute, be extremely confusing and inappropriate in a strict liability case. Un-der Nebraska law in order for the comparative negligence statute to be invoked the plaintiff's negligence must be slight and the defendant's negligence gross in comparison thereto. Neb.Rev.Stat. § 25–1151 (1964). *See Kloewer v. Burlington Northern, Inc.,* 512 F.2d 300 (8th Cir. 1975). In strict liability cases proof of negligence or degree of fault is not required. *See Greenman v. Yuba Power Products, Inc.,* 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (Cal.1962), cited in *Kohler v. Ford Motor Co.,* 187 Neb. 428, 191 N.W.2d 601, 606 (1971). *See also Foster v. Day & Zimmermann, Inc.,* 502 F.2d 867 (8th Cir. 1974).

Plaintiff's suggestion to instruct the jury to apply some form of comparative fault is better directed to the state court and Nebraska legislature in the first instance.

The judgment is affirmed.

BRIGHT, Circuit Judge (dissenting).

I respectfully dissent. An automobile manufacturer should not be held liable in a case such as this one where its design of a component meets the standards of the industry, and no unreasonable risk of harm should be apprehended to the user. I believe the Nebraska law is in accord with this view. Plaintiff has presented no evidence to show that the design of the Mustang door latch created an unreasonable risk of injury.

The majority opinion leaves an impression that this accident resulted from a slight impact. That is not the case. Plaintiff's experts were clear that the fairly modest glancing impact on the Mustang door was followed within "miliseconds" by a very severe blow to the rigid quarter pillar and rear wheel.[9] The speed, angle, se-

---

**9.** As the majority opinion indicates, engineer Egerer was the primary expert for the plaintiff. He was quick to interject the following caution:

[L]et me point out, when I talked about a minor impact, I was talking about the impact to the door. The impact to the car was quite a severe impact.

While he never quantified the impact to the rear of the Mustang, he apparently accepted the statement by Ford's counsel that "it literally tore that rear end loose didn't it?" Photographs in the record show heavy damage to both cars. It should be borne in mind that the Volkswagen was going at approximately 45 mph. and the Mustang at an uncertain speed perhaps as high as 55 mph.

Egerer repeatedly emphasized that the door opened only as a result of a dynamic interaction of both impacts—"after the impact to the door and after a severe blow had caused the rear panel to cave in." During cross-examination by Ford's counsel, Egerer gave the following testimony:

quence, and timing of the two impacts had to properly coincide to open the door in the manner alleged by plaintiff. In particular, it must not be thought that any impact which might briefly activate the latch would open the door. The latch was equipped with a secondary position into which it would fall as soon as pressure on the door eased off. Ford's counsel asked plaintiff's expert, Egerer, the following: "One of the purposes of that secondary position, of course, is a safety device in the latch itself, isn't that right?" Egerer responded, "Under most circumstances, yes." In fact, Egerer conceded that when he examined the latch after the accident when the activation lever was still "trapped" by the distortion of the sheet metal of the door the latch was in secondary position. However, he contended that the heavy blow to the Mustang's rear had occurred just before the lever fell the "minute" amount that put the latch into secondary and thus the door flicked open.

Plaintiff's experts testified that because of the location of the pivot points in the latch, it was possible for an inward horizontal force to be converted into an upward force which would open the latch. They conceded that not every inward force would have this effect and that differing speeds or angles of impact would produce different results. Plaintiff's experts also conceded that, as a general rule, so long as the horizontal force continued to hold the latch open, it also would hold the door shut, and that as soon as the force eased off the latch would drop down into secondary position and secure the door. However, they testified that in this case the driver of the Volkswagen cut his wheel sharply to the right, just prior to the collision, attempting to pass behind the Mustang. As a result, the Volkswagen wiped across the Mustang's relatively soft door in a split second, activating the latch, and then immediately struck the rigid quarter pillar and rear wheel, producing a severe jolt so quickly that the latch had no time to fall into the secondary latching position, and the door was therefore flicked open.

These experts testified that the pivot points could have been differently placed so that a horizontal force would be converted into a downward force which would tend to hold the door latch closed. They expressed their opinion that failure to incorporate this "fail safe" feature rendered the latch design "defective."

However, neither of plaintiff's experts was able to express any opinion of the likelihood that an automobile would be exposed to the concurrence of all of the facts necessary to activate the latch and open the door.[10] The only information of which they

Q. There is no way that this door can open when there is a force outside of it pushing it in, isn't that right?
A. That is right, but there is a way that it can open in a force which is a glance—well, it is an instantaneous time interval, then the door can fly open.
Q. But if I were * * * to take that hammer and strike the operating lever, that door wouldn't fly open, would it?
A. If a split second later you kicked that channel [a solid part of the frame] with a force perhaps one hundred times as much, it would.

Finally, it should not be thought that Egerer ever indicated that the impact on the door in this case was "very slight." To the contrary, he testified that many of the structural elements of the latch were bent and displaced. For example, the striker which is mounted on the frame was bent inwards two and three-fourths inches. Egerer testified that industry standards required these structures to resist an impact of 2,000 pounds, and plaintiff's attorney stipulated that they met those standards "and exceeded them by far."

10. Defendant's expert was an engineer with many years' experience in designing and crash testing Ford door latches, including the Mustang latch at issue in this case. At the beginning of his testimony it was established that he had been present during most of the testimony by plaintiff's experts and that he was familiar with their views. Yet when he attempted to testify that it would be "unusual" for an accident to occur in the manner alleged by plaintiff, plaintiff's attorney objected to his testimony "for lack of any foundation, showing that this witness knows anything about whether it is usual or unusual." The objection was sustained, possibly on other grounds. If, as plaintiff's attorney asserted, the testimony of his experts provided no basis from which another expert could determine the probability of such

were aware was a crash study conducted in 1969 by Cornell University. That study showed that of all major American makes of automobiles, Fords equipped with the very latch used on decedent's Mustang had the lowest rate of doors opening during collisions. Plaintiff's experts had compiled an exhibit of other types of American automobile door latches which they used by way of contrast to illustrate the "design defect" in the Mustang latch. Interestingly enough, these were the precise latches to which the Mustang latch was compared in the Cornell study. The plaintiff's experts conceded that each of these other latches could open upon impact—in other words, would not "fail safe" upon impact in certain circumstances dissimilar to those in the present case.

This is a Nebraska diversity case. The governing law is established by *Friedrich v. Anderson*, 191 Neb. 724, 217 N.W.2d 831 (1974), in which the Nebraska Supreme Court exhaustively reviewed the law of strict liability for defective automotive design in "second impact or collision" situations.[11]

The Nebraska Supreme Court enunciated the following as the rule applicable to enhanced injuries received upon a second impact, such as sustained in the present case:

> We therefore hold that a manufacturer of goods has a duty to use reasonable care in the design of goods to protect those who will use the goods from *unreasonable risk of harm* while the goods are being used for their intended purpose or any purpose which could be reasonably expected. The subjection of an automobile to accidental collision with another automobile or object while being used for

its intended purpose is a use which a manufacturer should reasonably expect. [*Id.* at 836 (emphasis added).]

Thus, the court accepted the possibility of liability for defective design which subjects the user to an unreasonable risk of harm. However, the court emphasized that

> an automobile manufacturer is not an insurer that its product is, from a design viewpoint, incapable of producing injury. Furthermore, in the application of the general rule, whenever a "second impact" or enhanced injury occurs, this should not be an open invitation to a jury to speculate as to the issue of foreseeability or the unreasonableness of the risk of harm. [*Id.*, 217 N.W.2d at 836.]

In my judgment, the plaintiff's case utterly failed to show that the construction of the Mustang door latch exposed the occupant of such automobile to any unreasonable risk of harm, bearing in mind that a door latch, in part, should be constructed in a manner that will enable an automobile rider to unlatch the door to conveniently get in or out of the automobile. The plaintiff's case showed that any unlocked door latch on the modern automobile can open, given the appropriate application of forces in a collision, and uncontradicted evidence showed that the Mustang latch was less dangerous in actual collisions than any other latch then being manufactured.[12] I am mindful, too, that the automobile manufacturer in this case provided door locks and safety belts for the use, if desired, of the occupant of the automobile.

In the *Friedrich* case, the court affirmed a summary judgment of dismissal of an automobile passenger's suit seeking recovery against the manufacturer on the theory

---

an accident, it is clear that the lay jury could not make such a determination without indulging in sheer speculation and conjecture.

11. In particular, the Nebraska court discussed and compared *Larsen v. General Motors Corp.*, 391 F.2d 495 (8th Cir. 1968), with *Evans v. General Motors Corp.*, 359 F.2d 822 (7th Cir. 1966).

12. I do not read the two cases cited by the majority at note 5, *supra*, to be particularly

applicable. There it was shown that the latches in question violated established industry standards and created a serious risk of injury. Interestingly enough, in *Bair v. American Motors Corp.*, *supra*, the court found it to be prejudicial error to exclude the 1968 Cornell study introduced in this case since the study was held to be probative of the industry standard. Of course, the Mustang latch in this case met all industry standards and ranked at the top in the Cornell study.

of strict liability (and other theories) for injuries sustained when plaintiff's face struck the gear shift lever knob after his automobile was struck on the left side, by another automobile. The collision caused the gear knob of one-half inch diameter to penetrate plaintiff's eye. For purposes of the appeal, the defendant had stipulated that the knob was defectively designed.

In the 1966 model Plymouth, the type of automobile involved in the accident, the manufacturer in the last half of the year increased the diameter of the gear knobs to one inch to conform to GSA specifications for automobiles to be purchased by the United States Government. The particular injury would have been less likely to occur had the plaintiff's car been equipped with the larger gear shift knob. Despite this evidence the trial court granted summary judgment for the defendant, finding that

> it is conclusively established there was no duty on the part of said defendants at the time of the manufacture and sale to design a gearshift lever knob so as to be incapable of producing the injury to this plaintiff or incapable of causing injury in the event of collision with another vehicle. [*Id.* at 833.]

The Nebraska Supreme Court affirmed the summary judgment and made the following finding:

> All the evidence relating to the claimed duty of the defendants to the plaintiff in design of the gearshift lever knob is before the court and is undisputed, and in our opinion is not sufficient that reasonable minds could properly find that the defectively designed product created a foreseeable and unreasonable risk of harm. [*Id.,*. 217 N.W.2d at 836.]

On the basis of this Nebraska rule of law, we should reject the jury verdict in the present case. This case virtually makes the

manufacturer the insurer of the safety of the occupants of an automobile and would impose a duty upon the automobile manufacturer to construct an automobile in such a way as to avoid injury to the occupants under almost any possible impact situation. To cast such a burden upon the manufacturer of an automobile is impractical and uneconomic.

No doubt the manufacturers of automobiles could design and build an automobile with the strength and crash-damage resistance features of an M–2 army tank. I believe the average and reasonable automobile user desires only a reasonably safe, economical form of motor transportation. No greater burden of design-performance ought to be imposed upon automobile manufacturers by either judge or jury.[13]

---

**13.** Prior to this action plaintiff attempted to recover against the driver of the Volkswagen. That action was wholly unsuccessful, largely because of evidence that decedent caused the accident by running a red light. *Melia v. Svoboda*, 191 Neb. 150, 214 N.W.2d 476, 477 (1974). It is ironic that this evidence was excluded in this case. I would think that this

evidence, taken together with decedent's failure to lock her door or wear her safety harness, would be admissible on the issue of whether the manufacturer should have foreseen an unreasonable risk of harm. However, since I would reverse outright, I do not further address this evidentiary question.