Monterey P. MORGEN, Appellant
(Plaintiff below),

v.

FORD MOTOR COMPANY, Appellee
(Defendant below).

No. 71S03–0211–CV–00593.

Supreme Court of Indiana.

Oct. 29, 2003.

Thomas A. Clements, David M. Hamacher, Hammond, IN, James L. Gilbert,

Paul J. Komyatte, Arvada, CO, Attorneys for Appellant.

David V. Scott, New Albany, IN, Thomas C. Doehrman, Indianapolis, IN, Attorneys for Amicus Curiae Indiana Trial Lawyers Association.

Julia Blackwell Gelinas, Nelson D. Alexander, Allison S. Avery, Indianapolis, IN, Attorneys for Appellee.

SULLIVAN, Justice.

A jury rejected Monterey P. Morgen's claim that Ford Motor Company was responsible for the serious injuries he suffered as a back seat passenger in an automobile accident. The Court of Appeals ordered a new trial on the ground that the jury had been improperly instructed on Morgen's failure to use his seat belt. We find that the instruction was not erroneous, and even if it were, it did not affect the jury's verdict.

### Background

On November 14, 1993, Monterey P. Morgen sat in the passenger-side rear seat of a 1984 Ford Escort Station Wagon, Morgen's girlfriend Kristy Snyder sat in the front passenger-side seat, and her mother Janet Snyder was driving. Morgen was not wearing the seat belt provided in the back seat.

The Escort was stopped at an intersection in Mishawaka when a 1991 Honda Accord hit the vehicle in the rear. Ford's expert estimated that the Honda Accord was traveling at 33 to 35 miles per hour but Morgen's expert estimated that it was traveling at 24 to 28 miles per hour. Regardless, the impact of the rear-end collision caused the Escort to crash into an Oldsmobile Cierra in front of it. The back of the Escort suffered substantial damage. Morgen sustained a spinal cord injury in the accident and is now quadriplegic.

Morgen filed a products liability suit against Ford Motor Company claiming that the Escort was defective and unreasonably dangerous. The two parties offered conflicting expert testimony to explain how Morgen was injured. Morgen's experts testified that the injury was caused when the rear seat deformed upward during the crash, reducing the occupant survival space and causing Morgen's head to strike the roof of the car. Morgen's experts further testified that the structural design of the Escort was defective and that a flaw in the manufacturing process created structural weakness in the vehicle.

Ford denied that the Escort was improperly designed and disputed Morgen's theory. Ford's experts testified that Morgen's neck was broken because the horizontal forces moving the vehicle launched him into the roof of the Escort. Ford pointed to evidence of rear-end crash tests showing that an unbelted back seat passenger's head does not move appreciably in a vertical direction in accidents of the type that happened here. Rather, Ford's experts testified, when the Escort was rear-ended, the car moved forward but Morgen did not. Instead, Morgen's torso remained in place as the seatback compressed and moved to a reclined position. The seatback then pushed him forward and as his torso was driven forward, his head and neck, which were above the seat, flexed backward. Ford claimed that Morgen's spinal injury occurred when he ramped up and over the seatback as the Escort moved forward. Ford also asserted that Morgen's decision not to wear a seat belt constituted a misuse of the Escort.

The trial court rejected jury instructions tendered by Morgen regarding the duty to warn of latent defects but it gave an instruction on misuse. The jury returned a verdict in favor of Ford. The Court of Appeals reversed and remanded on the ground that the trial court abused its discretion in giving an instruction on misuse. *Morgen v. Ford Motor Co.*, 762 N.E.2d 137, 140–44, 147 (Ind.Ct.App.2002). We granted transfer. 783 N.E.2d 701 (table).

Additional facts will be discussed as necessary.

## Discussion

### I

"Indiana's Product Liability Act imposes strict liability in tort upon sellers of a product in a defective condition unreasonably dangerous to any user or consumer." *Hinkle v. Niehaus Lumber Co.*, 525 N.E.2d 1243, 1244 (Ind.1988) (citing Ind. Code § 33–1–1.5–3[1]). The Act also provides that a misuse of the product can be a defense. Ind.Code § 33–1–1.5–4(b)(2) (1993).[2,3]

---

1. The Product Liability Act was recodified in 1998 at Ind.Code § 34–20 *et seq.* by P.L. 1–1998, § 15. Section 33–1–1.5–3 was recodified at Ind.Code § 34–20–6–1 (1998).

2. "It is a defense that a cause of the physical harm is a misuse of the product by the claimant or any other person not reasonably expected by the seller at the time the seller sold or otherwise conveyed the product to another party. Where the physical harm to the claimant is caused jointly by a defect in the product which made it unreasonably dangerous when it left the seller's hands and by the misuse of the product by a person other than the claimant, then the conduct of that other person does not bar recovery by the claimant for the physical harm, but shall bar any right of that other person, either as a claimant or as a lienholder, to recover from the seller on a theory of strict liability." Ind.Code § 33–1–1.5–4(b)(2) (1993). This section was recodified at Ind.Code § 34–20–6–4 (1998).

3. At least two recent decisions have held that under Indiana products liability law, the defense of misuse is not a complete defense, but instead is an element of comparative fault pursuant to Ind.Code § 34–20–8–1. *Chap-*

Ford argued at trial that Morgen's failure to use the seat belt provided in the back seat constituted a "misuse" within the meaning of the Act; no other misuse was alleged. Over Morgen's objection, the court read the following instruction on misuse to the jury:

> With respect to any product liability action based on strict liability in tort.... It is a defense that a cause of the physical harm is a misuse of the product by the claimant or any other person not reasonably expected by the seller at the time the seller sold or otherwise conveyed the product to another party.

(R. at 1101.)

The Court of Appeals determined that the trial court committed reversible error by giving this instruction. The court said that it had "repeatedly held that it is 'clearly foreseeable' that a passenger might fail to wear a safety belt," and that Indiana law does not require back seat passengers in automobiles to wear one. *Morgen*, 762 N.E.2d at 142. Given that failure to wear a seat belt was reasonably expected and that there was no clearly enumerated duty to do otherwise, the court concluded that failure to wear a seat belt could not constitute a misuse. *Id.* at 142–43.

We believe the instruction was properly given here. We see the essential question to be whether it was within the province of the fact finder to determine if the plaintiff's failure to utilize a safety device provided by the manufacturer constituted misuse of the manufacturer's product. While we agree with Morgen that his failure to use the seat belt did not constitute a misuse as a matter of law, so too do we agree with Ford that the question of misuse was a matter for the jury, not the court, to decide. We believe this result serves to encourage manufacturers to equip their products with safety devices irrespective of whether the devices' use is mandatory or even widespread.

▇▇▇ When a manufacturer does not reasonably expect it, a plaintiff's failure to use available safety devices can constitute misuse in a crashworthiness case. *See Leon v. Caterpillar Indus., Inc.*, 69 F.3d 1326, 1344 (7th Cir.1995) (applying Indiana law, the court stated "a person who disregards manufacturer safety devices raises an issue of misuse and, further, that evidence of such is sufficient to justify an inference of misuse") (citations omitted).[4] "Foreseeable use and misuse are typically questions of fact for a jury to decide." *Vaughn v. Daniels Co. (W.Va.)*, 777 N.E.2d 1110, 1129 (Ind.Ct.App.2002) (citation omitted), *trans. pending; Underly v. Advance Mach. Co.*, 605 N.E.2d 1186, 1189 (Ind.Ct.App.1993) ("The foreseeability of an intervening misuse is usually a question for the jury.") (citation omitted), *trans. denied.* A number of other jurisdictions have reached this same result in similar cases. *Melia v. Ford Motor Co.*, 534 F.2d 795, 797, 799 (8th Cir.1976) (stating that under Nebraska law it was proper for the jury to determine whether the decedent misused the product by failing to use a safety belt); *General Motors Corp. v. Walden*, 406 F.2d 606, 609 (10th Cir.1969)

man v. Maytag Corp., 297 F.3d 682, 689 (7th Cir.2002); *Barnard v. Saturn Corp.*, 790 N.E.2d 1023, 1030 (Ind.Ct.App.2003), *trans. pending.* The parties in this case make no argument along these lines and we express no opinion on it.

4. *Cf.* *Hopper v. Carey*, 716 N.E.2d 566, 576 (Ind.Ct.App.1999) ("the lack of a safety device cannot be the cause of the injuries if other adequate but unused safety devices were available to the plaintiff" (citing *DePaepe v. General Motors Corp.*, 33 F.3d 737, 746 (7th Cir.1994))), *trans. denied*, 735 N.E.2d 227 (Ind.2000) (table).

(holding that under Arizona law the court properly instructed the jury that the plaintiff's failure to wear a safety belt could be a misuse); *Brown v. Ford Motor Co.*, 67 F.Supp.2d 581, 582, 584–87 (E.D.Va.1999) (finding that under Virginia law evidence of pickup driver's failure to wear a safety belt was admissible in an action against the manufacturer as it relates to product misuse), *aff'd*, 10 Fed. Appx. 39, 2001 WL 285072 (4th Cir.2001).

It is true that the statute provides that the misuse defense is only available to the seller when the misuse was not reasonably foreseeable from the seller's perspective at the time the product was sold. *Underly*, 605 N.E.2d at 1189. When the Court of Appeals said that it had repeatedly held that it is "clearly foreseeable" that a passenger might fail to wear a safety belt, it was referring to three criminal cases. In each, the defendants sought to avoid liability for deaths caused by their driving on the ground that the victims were not wearing seat belts. *See Green v. State*, 650 N.E.2d 307, 309–10 (Ind.Ct.App.1995); *Warner v. State*, 577 N.E.2d 267, 270 (Ind. Ct.App.1991); *Bowman v. State*, 564 N.E.2d 309, 310 (Ind.Ct.App.1990), *rev'd and remanded on other grounds*, 577 N.E.2d 569 (Ind.1991). Not surprisingly, their claims were rejected on the basis that, because the failure to wear a seat belt was reasonably foreseeable, such failure was not an intervening cause sufficient to absolve the defendants of criminal responsibility.

We think the court's reliance on these cases proves too much. If it is so "clearly foreseeable" that a passenger will not wear a seat belt, it is difficult to see any harm

from the instruction given here. The jury was told that the misuse defense was *only* available if Ford did not reasonably expect the alleged misuse. If a passenger's failure to wear a seat belt is as "clearly foreseeable" as the Court of Appeals says it is, we think that would be just as clear to a jury and it could not render a verdict for the defense because there would be no misuse.[5] If, on the other hand, there was some genuine question about Ford's expectation of Morgen's failure to wear his seat belt, then this was a most appropriate question to submit to the jury, as the cases make clear. *See Leon*, 69 F.3d at 1344; *Vaughn*, 777 N.E.2d at 1129; *Underly*, 605 N.E.2d at 1189.

## II

■ Morgen tendered two jury instructions (nos. 6 and 13) that the trial court declined to use. Morgen contends that this constituted reversible error.

Morgen's proposed instruction no. 6 read:

> You may find that Ford Motor Company, because of its technical knowledge as a designer, manufacturer and distributor, knew or should have known of the dangers posed by the 1984 Escort in reasonably foreseeable rear end collisions and also knew that consumers such as Morgen, without the benefit of such technical information, could not have known of those dangers. If you so find, then you may find that Ford Motor Company owed the duty to warn of such dangers posed by the 1984 Escort.

(R. 1204.)

Morgen's proposed instruction no. 13 read: "Although a manufacturer is under no

---

**5.** *Cf. Indianapolis Athletic Club, Inc. v. Alco Standard Corp.*, 709 N.E.2d 1070, 1073 (Ind. Ct.App.1999), *trans. denied*, 726 N.E.2d 304 (Ind.1999), where the court found the giving of a misuse instruction to be harmless error where there was no evidence that the product had been misused. In the absence of any such evidence, it was unlikely that the jury could have based its defense verdict on misuse.

duty to warn of apparent dangers, a manufacturer has the duty to guard against hidden defects and give notice of concealed dangers." (R. at 1118.)

Rather than use Morgen's tendered instructions, the trial court used the text of the Product Liability Act. In relevant part, the jury was instructed as follows:

A product is in a defective condition if, at the time it is conveyed by the seller to another party, it is in a condition:

Not contemplated by reasonable persons among those considered expected users or consumers of the product; and

That will be unreasonably dangerous to the expected user or consumer when used in reasonably expectable ways of handling or consumption.

A product is defective under this chapter if the seller fails to:

(1) Properly package or label the product to give reasonable warnings of danger about the product; or

(2) Give reasonably complete instructions on proper use of the product; when the seller, by exercising reasonable diligence, could have made such warnings or instructions available to the user or consumer....

"Unreasonably dangerous" refers to any situation in which the use of a product exposes the user or consumer to a risk of physical harm to an extent beyond that contemplated by the ordinary consumer who purchases it with the ordinary knowledge about the product's characteristics common to the community of consumers.

(R. at 465–66.)

The Court of Appeals held the trial court's instruction inadequate. First, it found that the instruction "did not inform the jury of the information Ford needed to possess about defects in its product to trigger a duty to warn." *Morgen,* 762 N.E.2d at 146. In contrast, the Court of Appeals said that Morgen's tendered instructions "explained that Ford had a duty to warn consumers of hidden dangers Ford knew or should have known about, but that a consumer could not have known about." *Id.* On this basis, it concluded that Morgen's tendered instructions were not covered by the instruction given to the jury. *Id.*

Second, the Court of Appeals found that "Morgen's substantial rights were prejudiced by the failure to instruct the jury on the duty to warn regarding hidden defects" because this apparent disparity left the jury "to speculate as to what knowledge Ford needed before its duty to warn consumers arose." *Id.*

The instruction given at trial informed the jury that Ford had a duty to warn of "danger[s] about the product." Morgen's tendered instructions also instructed the jury that Ford had a duty to warn. However, Morgen's instructions focused on "hidden defects" and "concealed dangers." In so doing, we acknowledge that they more narrowly described the scope of Ford's duty to warn than did the trial court's instruction. But the trial court's instruction allowed the jury to find that Ford had a duty to warn of any "danger about the product." As a matter of logic, this included "hidden defects" and "concealed dangers." Accordingly, we believe the substance of Morgen's tendered instructions were covered by the instruction given at trial. For this reason, Morgen's substantial rights were not adversely affected by the trial court's refusal to read his tendered instructions.

■ Even if Morgen's instructions were not encompassed by the trial court's instruction, we do not find the record sufficient to warrant giving Morgen's tendered instructions on failure to warn.

The primary evidence supporting Morgen's tendered warning instructions is three-fold. First, Morgen provided evidence suggesting that Ford knew that the Escort was dangerous in rear-impact collisions and that consumers would not be aware of the danger. Second, Janet Snyder testified at trial that she "would not have purchased the car," and "wouldn't have let [Morgen] be in the back seat," had she been warned that danger to back seat passengers was a possibility. (R. at 3251–52.) Finally, Morgen testified that he would not have gotten in the Escort had he known of the potential danger.

There was, however, no testimony or evidence presented at trial on the content or placement of a warning that would have prevented the danger posed by the alleged defect. In *Nissen Trampoline Co. v. Terre Haute First Nat'l Bank*, 265 Ind. 457, 463–64, 358 N.E.2d 974, 978 (1976), this Court said that "supporting and opposing evidence relevant to a determination of what a proper warning should state . . . . [is] indispensable to a rational conclusion that the product was defective and unreasonably dangerous to the user without warnings, *and* to a rational conclusion that such unreasonably dangerous condition was the proximate cause of the accident and injury." Without such evidence, the parties and appellate courts are required to hypothesize as to specific warnings that would meet muster. *Id.*

The concern we expressed in *Nissen* applies equally here. As in that case, the jury here was instructed in such a way that it could determine Ford to be liable on the basis of a failure to provide an adequate warning. Morgen did present some evidence showing that the issue of warnings was a legitimate concern. However, as was also true in *Nissen*, neither party presented evidence as to what a warning could have said or where it could

have been placed. Without this evidence we are left to hypothesize as to what specific warnings would have made the Escort reasonably safe. We will not find the trial court's instructions inadequate without more.

### III

Morgen contends that the trial court committed reversible error in its jury instruction on proximate cause. The Court of Appeals found no reversible error in this regard, *Morgen*, 762 N.E.2d at 147, and we summarily affirm its conclusion on this issue, Ind. Appellate Rule 58(A).

### IV

Morgen contends that the trial court committed reversible error when it denied his request to present rebuttal testimony from two witnesses whom he claims would have provided additional analysis of crash tests performed by Ford in June, 1999.

" 'Rebuttal evidence is evidence that tends to explain, contradict, or disprove an adversary's evidence.' Trial courts may exclude testimony offered in rebuttal that should have been presented in the party's case in chief. However, such a decision is left to the sound discretion of the trial court." *McCullough v. Archbold Ladder Co.*, 605 N.E.2d 175, 180 (Ind.1993) (quoting *Watkins v. State*, 528 N.E.2d 456, 459 (Ind.1988)) (citations omitted). We review for an abuse of discretion.

Morgen maintains that Dr. Joseph Burton should have been allowed to testify that Ford's June, 1999, crash test film shows that the test dummy began moving up with the seat early in the crash, thereby implying that Morgen's injury was a result of a product defect and not the force of the crash. He also urges that deposition testimony of Jack Ridenour should

have been allowed arguing that the film analysis of the tests should control over the electronic data generated during the tests. Relying on *McCullough,* Morgen asserts that the excluded rebuttal testimony, "if believed by the jury, would likely have produced a different result" and therefore requires a new trial. (Br. of Appellant at 37 (quoting *McCullough,* 605 N.E.2d at 181).)

In *McCullough,* we clarified a rule that requires known and anticipated witnesses to be identified pursuant to a court order or to a proper discovery request. 605 N.E.2d at 179. After finding a violation of this rule, we noted that the trial court could properly have excluded testimony from unidentified witnesses as a sanction. We nonetheless remanded the case to the trial court because we found that it had been unclear whether it was necessary to identify known and anticipated witnesses in light of a tradition of nondisclosure of rebuttal witnesses among Indiana lawyers and in light of the fact that the excluded testimony would likely have produced a different result at trial. *Id.* at 181.

In contrast, Morgen does not suggest that Ford intentionally failed to disclose a known or anticipated witness in violation of a court order or of a proper discovery request. In fact, Morgen and Ford had agreed to allow Ford to introduce into evidence the disputed June, 1999, crash test data in return for Morgen being permitted to introduce computer animated drawings and a "surrogate" study.

Morgen further argues that his rebuttal testimony should have been admitted against Ford's expert witness, Dr. Roberts, because Morgen "did not have the luxury of knowing in advance of trial how Roberts intended to rely upon the ... tests" and that rebuttal was his "only opportunity to address this key testimony." (Br. of Appellant at 37.) Specifically, Mor-

gen maintains that Dr. Roberts's testimony "that the dummy's head did not move upward until *after* the seat deformed" came as a complete surprise because Ford's opening statement led Morgen to assume that Dr. Roberts would testify that Morgen's head collided with the roof of the car before the floor pan was pushed upward. (*Id.* at 35.)

As already noted, Morgen and Ford had an agreement that allowed Ford to present the data from the June, 1999, crash tests about which Dr. Roberts testified. Morgen claims that Dr. Roberts's testimony was a "surprise." However, Morgen had full access to Ford's crash test data before it was used at trial. In fact, the opinion Dr. Roberts expressed at trial was consonant with his opinion expressed in a pretrial deposition. The trial court could have concluded that Morgen was not unfairly surprised by Dr. Roberts's testimony at trial and, as such, it was well within its discretion to deny Morgen permission to call these witnesses.

### Conclusion

Having previously granted transfer, we now affirm the judgment of the trial court.

SHEPARD, C.J., and BOEHM, J., concur.

DICKSON, J., dissents with separate opinion.

RUCKER, J., dissents with separate opinion in which DICKSON, J., concurs.

DICKSON, Justice, dissenting.

In addition to concurring with Justice Rucker's dissent, I write to emphasize the point upon which I most strenuously disagree with the majority.

It is unquestionably error for a trial court to give an instruction on a proposition of law about which there was no evi-

dence. *Mullins v. Bunch,* 425 N.E.2d 164, 165–66 (Ind.1981); *Dahlberg v. Ogle,* 268 Ind. 30, 40, 373 N.E.2d 159, 165 (Ind.1978); *Wylie v. Myers,* 238 Ind. 385, 391, 150 N.E.2d 887, 890–91 (1958); *Birdsong v. ITT Continental Baking Co.,* 160 Ind.App. 411, 415, 312 N.E.2d 104, 107 (1974); *Summers v. Weyer,* 141 Ind.App. 176, 179–80, 226 N.E.2d 904, 907 (1967). Here the jury was instructed, over the plaintiff's objection, that "misuse of the product by the claimant or any other person *not reasonably expected by the seller at the time the seller sold or otherwise conveyed the product to another party*" is a defense to the plaintiff's claim. R. at 1101 (emphasis added). For this instruction to have been proper, it was thus necessary that there be evidence not only that the plaintiff misused the product, but also that such misuse was not reasonably expected by Ford Motor Company at the time it sold the 1984 Ford Escort.

There was absolutely no evidence at trial to establish that Ford Motor Company reasonably expected every rear seat passenger to always wear a seat belt. Such contention defies common sense. Not only in 1984, but even today, it is common knowledge that significant numbers of automobile passengers fail to wear their seat belts. The Indiana statute requiring the use of seat belts was not enacted until 1985 and it applied then, and today still applies, only to *front* seat occupants. Indiana Code § 9–19–10–2. It is preposterous to claim that Ford Motor Company did not reasonably expect some rear seat passengers in Ford automobiles occasionally to ride without buckling their seat belts. Because of the total lack of evidence establishing that the failure to wear rear seat belts was unforeseeable to Ford, the trial court clearly erred in giving the misuse instruction.

The erroneous giving of an instruction that is not based on the evidence is reversible error unless it clearly appears that no harm resulted. *Summers,* 141 Ind.App. at 180, 226 N.E.2d at 907. As noted in Justice Rucker's dissent, throughout the trial, Ford focused on the plaintiff's failure to wear a seatbelt. Given the jury's verdict favoring Ford, it cannot reasonably be claimed that no harm resulted from the erroneous misuse instruction. I would reverse the judgment of the trial court.

RUCKER, Justice, dissenting.

I respectfully dissent from that portion of the majority opinion declaring the trial court properly gave to the jury a product misuse instruction. "Misuse" is considered an "unforeseeable intervening cause" that relieves a manufacturer of liability. *Indianapolis Athletic Club, Inc. v. Alco Standard Corp.,* 709 N.E.2d 1070, 1072 (Ind.Ct.App.1999), *trans. denied.* It is a defense when a consumer's decisions and conduct are not "reasonably expected" from the standpoint of the manufacturer at the time of sale. Ind.Code § 34–20–6–4;[6] *Underly v. Advance Mach. Co.,* 605 N.E.2d 1186, 1189 (Ind.Ct.App.1993), *trans. denied.*

I agree that whether a consumer's conduct is reasonably foreseeable or expected falls "peculiarly within the province of the jury." *Short v. Estwing Mfg. Corp.,* 634 N.E.2d 798, 801 (Ind.Ct.App.1994), *trans. denied.* However, that is not the end of the matter. Rather, the burden is on the manufacturer to introduce evidence in support of its defense. *See, e.g., Marshall v.*

---

**6.** Specifically the statute provides:

It is a defense to an action under this article (or I.C. § 33–1–1.5 before its repeal) that a cause of the physical harm is a misuse of the product by the claimant or any other person not reasonably expected by the seller at the time the seller sold or otherwise conveyed the product to another party.

*Clark Equip. Co.,* 680 N.E.2d 1102, 1108–09 (Ind.Ct.App.1997) (noting that the manufacturer's product safety director testified that plaintiff operated machinery "in an unforeseeable manner"), *trans. denied.* As applied to the facts here, Ford had the burden of proving that it did not reasonably expect or reasonably foresee that Morgen, or any other back seat passenger for that matter, would fail to wear a seat belt in Ford's 1984 Escort wagon.

Tacitly acknowledging that it introduced no evidence on this point, Ford cites *Leon v. Caterpillar Indus., Inc.,* 69 F.3d 1326 (7th Cir.1995) for the proposition that "a person who disregards manufacturer safety devices raises an issue of misuse and, further, that evidence of such is sufficient to justify an inference of misuse." *Id.* at 1344. Ford's apparent position is that because there was testimony introduced at trial that Morgen was not wearing a seat belt at the time of the collision that alone was enough to raise a jury question on the issue of misuse.

In *Leon,* a disabling switch on a forklift malfunctioned and did not put the machine in neutral when the operator rose from his seat. After stepping down from the forklift and standing in close proximity thereto, the operator was severely injured when the forklift suddenly lunged forward striking him. The operator filed suit against the forklift manufacturer under theories of strict products liability, negligence, and breach of express and implied warranties. Ultimately the case went to the jury on the products liability claim only. The jury returned a verdict for the manufacturer and the operator appealed. Among other things he alleged trial court error in giving a jury instruction on misuse of the equipment. According to the forklift operator, "the jury should have been instructed that, as a matter of law, there was no evidence of product misuse, because one of [the manufacturer's] representatives ... testified that [the forklift operator] was using the forklift for an intended and appropriate purpose at the time of the accident ...." *Id.* at 1341–42.

Disagreeing with this argument and affirming the judgment of the District Court, the Seventh Circuit recounted the "ample evidence" introduced at trial to support giving the instruction, which included the operator's violation of "four independent safety violations." *Id.* at 1342–43. The Court continued: "[I]f [the forklift operator] had followed any one of the precautions listed above, he would not have been injured. We refuse to hold [the manufacturer] to a standard of liability that results in it being held responsible for the kind of gross carelessness and disregard for the safety rules and regulations exhibited by [the forklift operator]." *Id.* at 1343–44. It was in this context the Court went on to say:

> Our holding that there was sufficient evidence of product misuse to support a jury instruction and finding on the issue also finds support in this court's holding that a person who disregards manufacturer safety devices raises an issue of misuse and, further, that evidence of such is sufficient to justify an inference of misuse.

*Id.* at 1344. The case before us is readily distinguishable. The only "evidence" introduced at trial on the question of alleged misuse was testimony that Morgen was not wearing a seat belt at the time of the collision. This is insufficient to show Ford reasonably expected that Morgen would do otherwise. Ford contends that over the last twenty years or so state and federal governments, traffic safety organizations, as well as car manufacturers, have been "trumpeting the necessity of wearing seat belts." Ford's Pet. for Trans. at 5. Ford may be correct. However, this does not

answer the question of whether in the early stages of the campaign, in particular in 1983 when Ford placed its 1984 Escort wagon on the market, Ford expected that drivers or their passengers would necessarily heed the advice to wear seat belts. In fact the record shows Ford absolutely did not expect the vast majority of people to wear seat belts. In documents submitted to the National Highway Traffic Safety Administration (NHTSA) during the period Ford was selling first generation Escorts to the public, Ford commented on seat belt use of automobile occupants. More specifically, in one document a Ford senior executive referred to the "low rear safety belt usage rates of about 10 percent versus 38 percent for front seats." *See* Ford's July 1987 comments to Docket 87–08, Notice 1, R. at 473. Although this document was not part of the evidence presented to the jury,[7] it nonetheless belies the inference now made on appeal that Ford reasonably expected occupants of its automobiles to wear seat belts. The record is clear that when Ford sold the 1984 Escort wagon, Ford knew that 90% of rear seat occupants would not utilize seat belts.

Again, misuse is a defense when a consumer's decisions and conduct are not reasonably expected from the manufacturer's perspective at the time the product was sold. Here, there was simply no evidence introduced at trial from which the jury could infer Ford's reasonable expectation

either at the time of sale or at any other time.

An instruction given to the jury must be a correct statement of the law and be supported by evidence adduced at trial. *Elmer Buchta Trucking, Inc. v. Stanley,* 744 N.E.2d 939, 944 (Ind.2001). Because Ford introduced no evidence at trial on whether it reasonably expected Morgen to wear a seat belt, the trial court erred in giving a product misuse instruction.

An erroneous instruction requires reversal if it could have formed the basis for the jury's verdict. This court will assume the erroneous instruction influenced the jury's verdict unless the evidence of record shows the verdict could not have differed even with a proper instruction. *Canfield v. Sandock,* 563 N.E.2d 1279, 1282 (Ind. 1990). The record shows that at various points throughout the trial Ford focused on Morgen's failure to wear a seat belt. For example, during opening statements counsel for Ford declared, "[y]ou will also hear Dr. Roberts among others say very candidly to you they cannot tell you with engineering certainty that had this young man been wearing his seat belt at the time[,] this injury would have been avoided. Dr. Roberts will tell you that had this young man been wearing his lap belt he may have avoided this injury or certainly reduced the potential for the injury." R. at 2781–82. Dr. Roberts elaborated on this point during direct examination.[8]

---

**7.** Prior to trial Ford filed a motion in limine to exclude as evidence any reference to this and other documents submitted to the NHTSA. According to Ford these documents represented comments on proposed federal regulatory changes. Thus, Ford argued, introducing them into evidence would infringe upon its exercise of a First Amendment right to express views to public officials regarding the passage or enforcement of law and regulations. R. at 832. The trial court granted the motion. R. at 1074–78. And Morgen did not challenge the ruling on appeal. Although not

presented to the jury, the documents remain a part of the record before us and cannot be ignored.

**8.** [Counsel for Ford]: Now, as far as seat belts are concerned. Do you have an opinion based on a reasonable degree of mechanic engineering certainty as to whether the use by Mr. Morgen of his seat belt would have prevented his injuries?

[Dr. Roberts]: I do.

[Counsel for Ford]: And what is your opinion, sir?

When questioning one of its design engineer witnesses, Thomas Tiede, Ford brought home the point of the importance of wearing a seat belt.[9] The record also shows that through both direct and cross-examination of witnesses, Ford reminded the jury that Morgen was not wearing a seat belt at the time of the accident. *See id.* at 3258 (cross-examination of Janet Snyder, the driver of the car in which Morgen was passenger), 3351 (cross-examination of Morgen), 3837 (re-direct examination of Patrolman Daniel Huffman, first law enforcement officer to arrive at the scene of the accident).

This case was vigorously contested. Among other things the parties offered conflicting expert testimony to explain how Morgen was injured as well as conflicting expert testimony on whether the Escort was improperly designed. Given the emphasis Ford placed on Morgen's failure to wear a seat belt, coupled with the trial court's instruction on a point about which there was no evidence, I cannot share the majority's conclusion that "the instruction was not erroneous, and even if it were, it did not affect the jury's verdict." Op. at 1147. To the contrary, I am compelled to assume the erroneous instruction did indeed influence the jury's verdict. *Canfield,* 563 N.E.2d at 1282. I therefore dissent. The judgment of the trial court should be reversed and this cause remanded for a new trial.

DICKSON, J., concurs.

[Dr. Roberts]: I couldn't say it would have prevented them. I think it would have modified and moderated them. You should always have [the] belt. Particularly when you are being pushed from the rear by the seat back. That belt is going to help. To say he would have had no injury, I couldn't do that. But I think the belts help. They do help. You ought to wear them. I think they have some effect but complete elimination I couldn't say that. R. at 4209A–10.

9. [Counsel for Ford]: From a design engineering standpoint what is it we know about or what is it you know, I should say, about kinematics in the rear?
[Mr. Tiede]: For rear seats we know that the—and I'm talking rear seats like in a wagon or rear seats in a passenger car where it's got—where it's more rigid, where you have a bulk head there, our early testing showed that—that's where we really decided early on our lap belts were kind of important for rears too especially in that case. I run rear tests for front seat occupants where I've conducted them for litigation purposes to show lap belt helps there to [sic].
[Counsel for Ford]: Specifically in the rears—
[Mr. Tiede]: But for the rears we know that package back there because of the stiffness of the back and because of the configuration that what happens in the back is you are sitting lower, your knees come up higher so in that configuration that lap belt becomes even more important because of the way your kinematics, as you load into the seat and as you ramp up the back the lap belt is helpful in that scenario. *Id.* at 3489–90.